**HEALTHCARE AMERICA PLANS, INC., Plaintiff,**

v.

**Constance BOSSEMEYER, Defendant.**

**Constance A. BOSSEMEYER, Plaintiff,**

v.

**HEALTHCARE AMERICA PLANS, INC., and Group Health Plan of Salina Family Physicians, P.A., Defendants.**

**Civil Action Nos. 94–1327–KHV, 94–1434–KHV.**

United States District Court, D. Kansas.

Nov. 27, 1996.

Charles E. Millsap, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for Healthcare America Plans, Inc.

William R. Smith, Hershberger, Patterson, Jones & Roth, Marc P. Clements, Morrison & Hecker L.L.P., Wichita, KS, and Sheldon Weinhaus, St. Louis, MO, for Constance Bossemeyer.

Rodney G. Nitz, Salina, KS, for Group Health Plan of Salina Family Physicians, P.A.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff Constance A. Bossemeyer brings this action under ERISA, 29 U.S.C. § 1132(a)(1)(B), to recover benefits under a group health plan issued by defendant Healthcare America Plans, Inc. ("HAPI").[1] Plaintiff incurred medical expenses of approximately $77,000 in treatments for breast cancer, for which she claims HAPI is obligated. HAPI denied coverage, stating two reasons: (1) the procedure which plaintiff underwent was a "transplant" or "bone marrow transplant" not covered by the terms of the insurance contract; and (2) such procedure was "experimental, unproven, investigational or educational" and thus excluded from coverage by the contract.

The case was tried to the Court on July 29 and 30, 1996. Having considered the evidence submitted before and during trial as well as the parties' supplemental briefs, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

By reason of her husband's employment with Salina Family Physicians, plaintiff is a "beneficiary," as defined by 29 U.S.C. § 1002(8), of defendant Group Health Plan. Group Health Plan is an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1)(A), and it is implemented through the purchase of insurance from HAPI. HAPI is a fiduciary as defined by 29 U.S.C. § 1002(21), because it exercises discretionary authority over some claims for coverage under the plan.

A Certificate of Coverage sets forth the terms of the health insurance coverage provided by HAPI. The Certificate of Coverage contains the following provisions:

Health Plan will provide the following Medically Necessary Health Services, subject to the terms and conditions as stated in this contract:

\* \* \* \* \* \*

Approved Transplants in Plan–Approved Facilities. When authorized in advance by Health Plan. Benefit is limited to $100,000 lifetime maximum for all services including but not limited to facility, physician, and ancillary charges. Approved transplants include: Heart, Heart–Lung, Kidney, Liver for children with congenital biliary atresia, cornea, and bone marrow transplants for the following conditions: aplastic anemia, leukemia, severe combined immunodeficiency disease, and Wiskott–Aldrich syndrome.

\* \* \* \* \* \*

---

1. HAPI brought an action against Ms. Bossemeyer seeking declaratory judgment on August 22, 1994 (Case No. 94–1327). Ms. Bossemeyer subsequently sued HAPI and Group Health Plan of Salina Family Physicians, P.A., for damages on September 30, 1994 (Case No. 94–1434). For ease of reference, the Court refers to Ms. Bossemeyer as "plaintiff" and to HAPI as "defendant" in this memorandum and order.

## II. Exclusions and Limitations

This Agreement does not cover (unless otherwise specified) any of the following:

   \*    \*    \*    \*    \*    \*

11. Medical, surgical, psychiatric procedures, organ transplants and pharmacological regimens, and associated health procedures which are considered to be experimental, unproven or obsolete, investigational or educational as determined by Health Plan. "Experimental" means those procedures and/or treatments which are not generally accepted by the medical community....

12. Organ transplants or artificial organs. However, if Medically Necessary and authorized in advance by the Health Plan Medical Director, Health Plan will cover ... bone marrow transplants for aplastic anemia, leukemia, severe combined immunodeficiency disease, and Wiskott–Aldrich syndrome....

In its Certificate of Coverage, HAPI agreed to provide plan participants and beneficiaries the "Medically Necessary Health Services" described therein, including room, board and general nursing services to inpatients at hospitals. It also agreed to cover blood transfusions and "standard-dose chemotherapy."

In November 1993, plaintiff was diagnosed with Stage II, node positive breast cancer.[2] Her primary tumor was approximately three centimeters when diagnosed, and 14 of her 23 axillary lymph nodes were involved with the tumor. Plaintiff underwent a lumpectomy, lymphadenectomy and several months of standard-dose chemotherapy, all of which the Group Health Plan covered.

On December 22, 1993, plaintiff's oncologist, Dr. David B. Johnson, met with plaintiff to discuss the possible use of "bone marrow transplantation" as follow-up treatment for her breast cancer. Because 14 lymph nodes were involved in plaintiff's cancer, Dr. Johnson believed that her best chance for long-term survival required the administration of a procedure called HDC/PBSCR.[3] HDC/PBSCR is a three-step process. First, blood stem cells are harvested from the patient's circulating, or peripheral, blood and placed in temporary storage.[4] Next, the patient undergoes a cycle of high dose chemotherapy ("HDC") in hopes of killing the cancer cells. Because the chemotherapy also attacks the blood stem cells, it is necessary to reserve some of them before the HDC; otherwise, the HDC would destroy the stem cells, rendering the patient highly susceptible to infection. Finally, after administration of the HDC, the stored blood stem cells are reinfused into the patient's bloodstream to relieve the patient of the toxic effects of the HDC.

A procedure closely related to HDC/PBSCR, frequently used with breast cancer patients and frequently discussed in the relevant cases and medical literature, is called autologous bone marrow transplant

---

2. The parties agree that breast cancer is divided into four stages, increasing in severity from Stage I to Stage IV (metastatic) breast cancer and characterized as follows:

  *Stage I:* (a) A tumor which is two centimeters or less in its greatest dimension;
(b) No involvement of axillary lymph nodes; or
(c) No evidence of distant metastases.
  *Stage II:* (a) A tumor two centimeters or less in its greatest dimension with positive axillary nodes and no distant metastases; or
(b) A tumor more than two but less than five centimeters in its greatest dimension with or without axillary lymph node involvement and no distant metastases.
  *Stage III:* (a) Tumors between two and five centimeters in their greatest dimension with positive axillary nodes fixed to one another or to other structures and no distant metastases; or

(b) Tumors greater than five centimeters in their greatest dimension with or without axillary lymph node involvement and no distant metastases.
  *Stage IV:* (a) A tumor of any size with direction extension to chest wall or skin; or
(b) Any tumor with involvement of homolateral supraclavicular or infraclavicular lymph nodes; or
(c) Any tumor with distant metastases including skin involvement beyond the breast area.

3. "HDC/PBSCR" means "high dose chemotherapy/peripheral blood stem cell rescue." The procedure is also referred to as "HDC/PBSCT," which means "high dose chemotherapy/peripheral blood stem cell transplant."

4. Stem cells, which generate white blood cells, are found within the blood.

("ABMT," or "HDC/ABMT").[5] HDC/ABMT works the same way as HDC/PBSCR, except that bone marrow instead of circulating blood is extracted before the HDC and later reintroduced into the patient.

On May 4, 1994, Dr. Johnson requested that HAPI pre-approve payment of expenses for plaintiff's HDC/PBSCR. HAPI informed plaintiff that a request for payment for services must be made by her primary care specialist. Accordingly, on May 17, 1994, Dr. W.R. Baxter, plaintiff's primary care specialist, sent HAPI a request to treat plaintiff's cancer with HDC/PBSCR. That same day, HAPI sent a letter to plaintiff's husband, stating that HDC/PBSCR was consistent with a bone marrow transplant and that services associated with bone marrow transplants for breast cancer were not covered under the scope of the Certificate of Coverage. HAPI claims that by the time it sent this letter, three separate sources had informed it that the procedure for which plaintiff sought coverage was a bone marrow transplant.

On May 18, 1994, plaintiff's husband called HAPI to comment on the May 17 denial of coverage. He stated his opinion that "bone marrow transplant for breast cancer is now a treatment of choice for women with breast cancer." HAPI referred him to the grievance procedure set forth in the plan.

On June 1, 1994, Karen Hudson, an associate of Dr. Johnson's at the Cancer Center of Kansas, contacted HAPI on plaintiff's behalf to ask which facilities were approved transplant facilities under the plan. HAPI requested that the Cancer Center send information about the proposed procedure, particularly information regarding whether it was experimental or investigational.

On June 2, 1994, Dr. Johnson wrote to HAPI, explaining in some detail his proposed course of treatment and stating that HDC/PBSCR "is used for patients who are at very high risk for reoccurrence which Mrs. Bos-semeyer qualifies at since she had ten axillary lymph nodes involved with her cancer." Attached to the letter was a CPT billing code [6] for the proposed procedure, which had been prepared by Dr. Johnson's office. It included the following information:

### BONE MARROW TRANSPLANT CPT CODE AND CHARGES:

| CODE | DESCRIPTION | CHARGE |
|---|---|---|
| 38230 | Bone Marrow Harvest | 1,500.00 |
| 38240 | Allogenic Bone Marrow Transplant | 600.00 |
| 38241 | Autologous Bone Marrow Transplant —Stem Cell Rescue | 600.00 |

Although Dr. Johnson included stem cell rescue in the above description of proposed services, section 38241 of the CPT coding book actually includes only autologous bone marrow transplants and makes no mention of stem cell rescue. In fact, the CPT code book nowhere refers to "stem cell rescue."

In response to HAPI's initial denial of coverage, plaintiff retained counsel, J. Bradley Leitch of Kansas City. Leitch sent a letter to HAPI dated June 7, 1994, arguing that the proposed procedure for treatment of plaintiff's breast cancer was not a bone marrow transplant and therefore should not fall under the plan's exclusion for transplants. Leitch cited several cases in which courts had considered the proposed procedure and concluded that it should be covered under various insurance contracts. In addition to the citations Leitch supplied, HAPI conducted some research of its own and found some cases in which courts had upheld insurance decisions not to pay for HDC/ABMT.

On June 9, 1994, HAPI's Patient Care Committee considered plaintiff's grievance regarding HAPI's denial of coverage for her proposed treatment. The Patient Care Committee consisted of the following members: Acting Chairman Dr. Randall Morgan, obstetrics and gynecology; Dr. Thomas Peters, internal medicine; Dr. Steven Chavez, pediatrics; Dr. Joseph Robertson, general surgery; Ms. Valerie Keller, accredited records

---

5. When discussing transplants, "autologous" means that the organ or substance comes from the patient herself; an "allogenic" transplant, on the other hand, occurs when an organ or substance is transplanted from one person into another.

6. The CPT code book is a listing of descriptive terms and identifying codes for reporting medical services and procedures. One of its primary functions is to regularize medical nomenclature for reporting medical services to insurance programs.

technician; and Ms. Karen Dunn, registered nurse. Three of the four doctors on the committee held no other position with HAPI, held no financial or other interest in HAPI or its parent corporation, and received only a modest payment for serving on the committee.

The Patient Care Committee reviewed the following documents in connection with plaintiff's grievance: Dr. Johnson's letter request of May 4, 1994; Dr. Baxter's request for approval dated May 17, 1994; Dr. Johnson's explanatory letter of June 2, 1994; Leitch's letter of June 7, 1994; and two items in the *Hayes Directory of New Medical Technology Status:* "Peripheral Blood Stem Cell, Autologous," dated October 15, 1993, and "Autologous Bone Marrow Transplantation," dated February 28, 1994. The minutes of the Patient Care Committee meeting indicate that the committee also referred to Health Care Finance Administration ("HCFA") coverage status and a letter from the Kansas Insurance Department dated June 8, 1994.

The Patient Care Committee determined that the HDC/PBSCR treatment proposed for plaintiff's breast cancer was a transplant and was not covered by the Certificate of Coverage. The Committee also found for the first time that the procedure should not be covered because it was "experimental" and "investigational" for treatment of breast cancer. On June 21, 1994, HAPI wrote to plaintiff's husband and notified him of the Patient Care Committee's findings.

Since the Patient Care Committee's decision was not the final stage of the grievance process, Valerie Keller of the Patient Care Committee and Dr. Robert Boyer, the Medical Director for HAPI, continued an investigation regarding whether HDC/PBSCR should be considered experimental. Keller contacted Dr. Gary Doolittle, an oncologist at the University of Kansas Medical Center.

Dr. Doolittle told Dr. Boyer that he would consider the procedure non-experimental if there was a "clear response to initial standard chemo," which he defined as a 50% improvement. In plaintiff's case, there is no diagnostic evidence of any improvement or curative effect from standard dose of chemotherapy because her tumor was removed, and she received high dose chemotherapy not as a cure, but as a precaution against the cancer's recurrence.[7]

Dr. Boyer also contacted Dr. Edward Lee, an oncologist at the University of Maryland Cancer Center. Dr. Lee stated that HDC/PBSCR for the treatment of breast cancer was "absolutely reasonable" and "should be accepted as standard of care." He also stated that the procedure was not the subject of "randomized studies" and should be the subject of a Phase III[8] research study to determine if it will, in fact, become a valid treatment.

HAPI contacted Blue Cross/Blue Shield of Kansas, which stated that its organization did not consider HDC/PBSCT experimental, and that coverage would depend on medical necessity. On July 5, 1994, HAPI also contacted the medical director of Michigan Blue Cross/Blue Shield, Dr. Seymour Adelson, to request an opinion regarding whether stem cell rescue for carcinoma of the breast was experimental or investigational. HAPI did not ask Dr. Adelson to differentiate among the stages of breast cancer and did not include the exclusionary language from plaintiff's Certificate of Coverage or ask him to analyze such language. On July 11, 1994, Dr. Adelson gave HAPI his opinion that HDC/PBSCR is currently in an experimental or investigational stage:

> There are currently randomized trials planned, or under way, for patients with stage II breast cancer with 10 or more nodes and for patients with stage III dis-

---

7. Dr. Johnson, plaintiff's treating physician, believes that Dr. Doolittle's comments in this regard were directed toward the treatment of Stage IV, metastatic breast cancer and that they therefore have no relevance to plaintiff's medical situation.

8. A Phase III study is conducted to determine the effectiveness of a treatment relative to the natu-

ral history of a disease, to determine whether the new treatment is more effective than standard therapy, and to determine whether a new treatment is as effective as standard therapy, but with less morbidity. The existence of a randomized study indicates that physicians do not know reliably which treatment is best.

ease, which will compare results of high dose therapy with stem cell rescue to conventional therapy. One such trial is jointly sponsored by the National Cancer Institute and the Blue Cross Blue Shield Association. It is hoped that these randomized trials will ultimately answer the question of the comparative safety, efficacy, and value of high dose, myeloablative therapy.

My study of the medical literature has led me to the conclusion that high dose therapy with stem cell rescue is presently in an experimental/investigational stage of development for breast cancer.[9]

In making its decision, HAPI considered the "Hayes Ratings," which comprise a system developed to reflect the degree of acceptance of a procedure as a "standard of care" and its sanction for use and/or payment by the federal government. One of the Hayes reports which HAPI considered was dated October 15, 1993. It stated that:

Autologous PBSCT is under investigation in several oncology centers throughout the United States. Promising results have been seen in a number of cases.... Whether high-dose chemotherapy followed by PBSCT and/or ABMT is superior to intensive chemotherapy without stem cell support must be addressed in further prospective, randomized, controlled clinical trials.

The Hayes report rated the use of HDC/ PBSCT for breast cancer as "C." According to the Hayes rating scale a "C" indicates *"Investigational and/or experimental.* The data on this procedure are *promising,* but *inconclusive,* regarding safety and efficacy. There is no clear medical consensus regarding its efficacy and/or safety" (emphasis in

original). Another Hayes report which HAPI obtained, dated February 28, 1994, gave HDC/ABMT for use in treatment of Stage II breast cancer a "C" rating and commented that "[w]ith the results that are available, it cannot be demonstrated that high-dose chemotherapy with ABMT is superior to conventional treatment of breast cancer."[10]

During its investigation, HAPI also learned that the federal Health Care Finance Administration ("HCFA") considers this treatment experimental/investigational, although there is no evidence as to whether HCFA's definition of "experimental" is the same as HAPI's. HAPI also contacted the National Cancer Institute, which confirmed that the procedure in question was the subject of several clinical trials. HAPI reviewed several other publications regarding the procedure during the course of its review of plaintiff's claim, many of which indicated that the procedure for which she sought coverage was still a subject of research trials and others that indicated HDC/PBSCR had gained wide acceptance as a course of treatment.[11]

On July 21, 1994, the Patient Care Committee further considered plaintiff's grievance and reaffirmed its decision to "deny payment of the ABMT and HDC/PBSCT for treatment of breast cancer." The only difference in the make-up of the Patient Care Committee for purposes of this review was the addition of Dr. Boyer, who served as chairman.

On July 28, 1994, Dr. Bradley Skikne, a professor of medicine at the University of Kansas Medical Center to whom plaintiff had been referred for evaluation, requested

9. Plaintiff complains that Dr. Adelson's opinion should be given little weight, since he is not a practicing oncologist. Before he quit practicing to work in the insurance industry, Dr. Adelson specialized in internal medicine, with an emphasis in allergy. However, HAPI notes that Dr. Adelson has testified in many cases regarding insurance coverage for HDC and that in furtherance of his duties at Michigan Blue Cross/Blue Shield, he attends conferences and stays informed regarding medical literature and studies published on the subject.

10. Plaintiff argues that this evidence is irrelevant because the Hayes reports indicate what is considered "standard of care," and the "experimental" exclusion in the Certificate of Coverage does not require a determination regarding what is "standard of care"; rather, it only refers to what is generally accepted in the medical community. Furthermore, the reports in the Hayes series do not use the same definitions of experimental and investigational as HAPI's Certificate of Coverage does.

11. Plaintiff claims that some of the sources HAPI reviewed were outdated.

HAPI's approval of a "peripheral stem cell transplant." He also had a conversation with Dr. Boyer in which he stated that HDC with stem cell rescue gave the "best chance for significant remission."

HAPI's grievance procedure allows a member to appeal an adverse decision by the Patient Care Committee to the Board of Directors, which plaintiff did. The hearing with the Board was set for August 9, 1994. Before the hearing, Sheldon Weinhaus, one of plaintiff's attorneys, sent HAPI an extensive letter reviewing the facts of the case in light of recent court decisions and medical literature. He reviewed the current state of the law and oncology and listed insurance companies which no longer considered HDC/PBSCR experimental or investigational. Attached to the letter as an appendix were several documents consisting of medical articles and legal testimony and decisions, including the following:

a. Letters from 22 universities and cancer centers, dating 1988–90, stating that HDC/ABMT and/or HDC/PBSCR for the treatment of breast cancer were not experimental and were generally accepted by the medical community.

b. Letters from 34 universities and cancer centers in 1992 stating the same.

c. A letter from the AMA encouraging third-party payors to be flexible in applying the "investigational" exclusion.

d. Seventeen abstracts from peer-reviewed medical literature stating that HDC/ABMT and/or HDC/PBSCR are generally accepted in the medical community.

e. An affidavit from Dr. Vaughn, a practicing oncologist at the University of Nebraska Medical Center, stating that HDC/PBSCR is "the best course of treatment," is "not investigational," and is "generally accepted as an appropriate treatment of breast cancer."

f. Transcripts of seven oncologists' testimony in court cases that HDC/PBSCR is a generally accepted procedure for the treatment of some breast cancers and is not investigational.

g. A news release regarding legislation in Virginia that requires health insurers to pay for HDC/ABMT for breast cancer treatment.

h. Other miscellaneous legal documents and court decisions regarding insurance coverage for HDC/ABMT and/or HDC/PBSCR.[12]

The Weinhaus materials, along with additional materials submitted by plaintiff, were distributed to the Board before its meeting. The Board also reviewed the materials collected by Ms. Keller and the Patient Care Committee.

The Board conducted a grievance hearing on August 9, 1994. The Board members in attendance were: Mr. Aldo Giacchino, chairman; Dr. Gerard Bassell, an anesthesiologist; Dr. Randall Morgan, an obstetrician/gynecologist; and a Mr. Rodney Cart. Absent directors included Stan Vaughn, corporate CFO; John Harder, corporate secretary; and Peter Phillips. All of the directors who participated in plaintiff's grievance hearing either owned stock in Healthcare America, Inc., owned unexercised options to purchase stock in Healthcare America, Inc., or owned stock in a professional corporation that owned shares of Healthcare America, Inc.[13]

In its "final coverage decision," which was contained in a letter to Weinhaus dated August 19, 1994, HAPI's Board reaffirmed the determination of the Patient Care Committee to deny coverage for plaintiff's HDC/PBSCR. In deciding whether plaintiff's proposed treatment was covered under its Certificate of Coverage, HAPI was operating under a limited conflict of interest. If it had deter-

**12.** Defendant points to several defects in the material submitted by Weinhaus. For example, Weinhaus's letter stated that plaintiff would be unable to obtain the procedure without coverage, but she later did undergo the treatment. Weinhaus also stated that plaintiff had never requested approval of a "transplant," but the record indicates that several inquiries and references to a bone marrow transplant were made on plaintiff's behalf.

**13.** Healthcare America, Inc., is the parent corporation of HAPI and owns all of HAPI's stock.

mined that the procedure was covered, HAPI would have been required to pay the first $30,000 of expenses incurred; eighty percent of the additional expenses would have been covered by a reinsurance policy issued by Allianz Life Insurance Company of North America.

On August 29, 1994, HAPI received a letter from the Kansas Insurance Department ("KID") that criticized HAPI's decision with regard to plaintiff's treatment and requested that HAPI provide coverage.[14]

On August 22, 1994, HAPI filed an action (Case No. 94–1327–MLB) for declaratory judgment. That action was consolidated with plaintiff's case (Case No. 94–1434–MLB) on October 19, 1994.

Since the time that HAPI rendered its final coverage decision, plaintiff has submitted to the Court affidavits from five leading oncologists, saying that HDC/PBSCR is the treatment of choice in appropriate cases of breast cancer, is generally accepted by the medical community, is not experimental, and is not a transplant. Defendant contends that the Court should not consider these affidavits because they were not before the fiduciary at the time of the final coverage decision.[15] Furthermore, defendant complains that the affidavits do not differentiate among the different stages of breast cancer and do not offer an opinion as to whether the treatment is investigational.

Dr. Johnson, plaintiff's treating oncologist, has also testified that HDC/PBSCR is the treatment of choice, is generally accepted by the medical community, is not experimental, is not a transplant and is not a bone marrow transplant. Defendant notes that Dr. Johnson has also made statements that would tend to contradict this testimony. For example, he stated that HDC is "leaning" toward general acceptance in the medical community outside the clinical settings and that the initial data on the treatment needed to be confirmed in a larger, randomized setting.

Dr. Johnson claims that he based his proposed course of treatment on the "best study available," a 1993 article by Dr. Peters of Duke University, which addresses this type of treatment for women with plaintiff's condition. Defendant takes issue with Dr. Johnson's interpretation of the Peters article and points to several passages in it which defendant contends demonstrate that the treatment is still investigational and under study.

Efforts are currently underway to determine the potential benefits of HDC in the treatment of solid tumors such as breast cancer. Dr. Johnson himself is involved in a Phase III study on this topic. Plaintiff was not qualified to participate in Dr. Johnson's study because she had had a prior case of malignant melanoma. Dr. Johnson testified that if plaintiff had qualified for the study, he would have encouraged her to participate in it, in which case she would have had a 50% chance of not receiving the proposed treatment (as a member of the control group). If she had participated, without initially receiv-

14. Defendant complains that the letter evidences the fact that the KID misunderstood the dispute between HAPI and plaintiff. Defendant points out that: (1) the author of the letter believed that HAPI had denied coverage solely under an exclusion for bone marrow transplants; (2) the author referred to plaintiff's condition as "metastatic breast disease," although plaintiff's cancer was not metastatic; (3) the author acknowledged that the National Cancer Institute still considers the procedure at issue to be "in clinical trial," and not yet "the standard of care"; (4) the author challenged HAPI to help fund ongoing clinical trials using the procedure at issue, apparently unaware that plaintiff did not even meet the criteria to participate in those Phase III trials.

15. The Board memorialized its "final coverage decision" in a letter dated August 19, 1994. The Court considers only the evidence before the fiduciary when it made its decision. *Sandoval v.*

*Aetna Life and Cas. Ins. Co.,* 967 F.2d 377, 381 (10th Cir.1992) ("In effect, a curtain falls when the fiduciary completes its review, and for purposes of determining if substantial evidence supported the decision, the district court must evaluate the record as it was at the time of the decision."). *See also Motley v. Metropolitan Life Ins. Co.,* 834 F.Supp. 1272, 1277 (D.Kan.1993). It is the plan participant's duty to bring evidence to the administrator's attention, and the participant cannot complain of the administrator's failure to consider evidence not before it. *Sandoval,* 967 F.2d at 381. *Healthcare America Plans, Inc.'s Motion in Limine* (Doc. # 80) filed June 20, 1996, which the Court took under advisement at the time of trial must therefore be sustained to the extent that it sought to exclude evidence which was not before the fiduciary at the time it made its final coverage decision.

ing the treatment, but then had a relapse of the cancer, plaintiff's participation in the study would have terminated with the option of receiving treatment outside of the study.

In September 1994, Dr. Johnson treated plaintiff with HDC/PBSCR. She incurred medical expenses of $77,682.93, which HAPI refuses to pay. HAPI asserts that it has never paid for HDC for the treatment of cancer.

### Analysis

#### A. Standard of Review

■■■ A denial of benefits challenged under ERISA § 1132(a)(1)(B) is reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). If the plan gives the administrator discretionary authority, the standard is arbitrary and capricious. *See id.* Where there is both discretion and a conflict of interest, the conflict must be weighed as a factor in determining whether there was an abuse of discretion. *Id.; Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 826–27 (10th Cir.1996).

■■■ As to its denial of coverage on the ground that plaintiff's treatment constituted a "transplant" or "bone marrow transplant," HAPI concedes that it did not have discretion to interpret the Certificate of Coverage's provisions. Therefore the standard of review is de novo on this issue. As to the second basis on which HAPI denied coverage, the plan excluded "[m]edical … procedures … which are considered to be experimental, unproven or obsolete, investigational or educational as determined by Health Plan." Since this language clearly confers discretion on the plan administrator, the standard of review is whether the plan administrator's coverage decision was arbitrary and capricious.

#### B. Transplant Issue

HAPI denied coverage for plaintiff's HDC/PBSCR for the stated reason that such procedure constituted a "transplant" or a "bone marrow transplant" and was therefore not covered under the plan. In defending its denial of coverage, HAPI relies on the following language in the plan:

> Approved Transplants in Plan–Approved Facilities. When authorized in advance by Health Plan. Benefit is limited to $100,000 lifetime maximum for all services including but not limited to facility, physician, and ancillary charges. Approved transplants include: Heart, Heart–Lung, Kidney, Liver for children with congenital biliary atresia, cornea, and bone marrow transplants for the following conditions: aplastic anemia, leukemia, severe combined immunodeficiency disease, and Wiskott–Aldrich syndrome.

> \* \* \* \* \* \*

> II. Exclusions and Limitations
> This Agreement does not cover (unless otherwise specified) any of the following:

> \* \* \* \* \* \*

> 12. Organ transplants or artificial organs. However, if Medically Necessary and authorized in advance by the Health Plan Medical Director, Health Plan will cover … bone marrow transplants for aplastic anemia, leukemia, severe combined immunodeficiency disease, and Wiskott–Aldrich syndrome
>
> . . . .

Clearly, plaintiff did not undergo a bone marrow transplant. The question before the Court is thus whether HDC/PBSCT constitutes a "transplant" [16] not covered by the plan or whether as a matter of law, HAPI's decision to deny coverage was wrong. Plaintiff argues that (1) HDC/PBSCR does not involve a "transplant," (2) the procedure is more analogous to a blood transfusion than a transplant, (3) the transplant exclusion in the plan was intended to apply only when a third-party donor is involved (an allogenic transplant) and not to autologous procedures,

---

**16.** The Certificate of Coverage does not exclude coverage for PBSCR or for blood transfusions.

It includes coverage for medically necessary procedures unless limited or excluded.

and (4) blood is not an organ and Exclusion 12 refers only to organ transplants. Finally, plaintiff argues that even if her treatment involved a transplant, HAPI should not be permitted to deny coverage of the HDC because PBSCR is only a small percentage of the entire treatment and a small fraction of the cost of HDC/PBSCR. She argues that the HDC is the medically necessary treatment for cancer, and the PBSCR is only a necessary incident to that procedure. Therefore, to deny coverage for the entire treatment because of the incidental transplant would be, as one court has aptly described it, to allow the "tail to wag the dog." *See Wilson v. Group Hospitalization & Medical Serv., Inc.,* 791 F.Supp. 309, 313 (D.D.C. 1992). Defendant contends that its decision was right.

While both plaintiff and defendant have presented forceful arguments as to why the Court should or should not consider the procedure at issue here a transplant, the Court need not analyze that issue in detail because it has determined that HAPI's second reason for denying plaintiff's claim disposes of the case. Accordingly, the Court turns now to a discussion of that issue.

C. Experimental, Unproven, Investigational, or Educational Exclusion

Plaintiff's Certificate of Coverage provides coverage for medically necessary health services, subject to the plan's stated limitations and exclusions. In denying coverage for plaintiff's HDC/PBSCR, HAPI does not assert that the procedure was not medically necessary to treat plaintiff's cancer. HAPI relies instead on Exclusion 11 to the policy, which provides:

This Agreement does not cover (unless otherwise specified) any of the following:

\* \* \* \* \* \*

11. Medical, surgical, psychiatric procedures, organ transplants and pharmacological regimens, and associated health procedures which are considered to be experimental, unproven or obsolete, investigational or educational as determined by Health Plan. "Experimental" means those procedures and/or treatments which are

not generally accepted by the medical community. . . .

HAPI denied coverage for plaintiff's HDC/PBSCR, stating that

The Board of Directors . . . finds that high dose chemotherapy with autologous peripheral blood stem cell transplantation is currently experimental, unproven, investigational or educational, within the meaning of Exclusion 11. The Board of Directors rejects the contention that organizations such as the Health Care Finance Administration, the National Institute on Health, or the National Cancer Institute are "bureaucrats" incapable of making a reasoned decision on the status of such treatment.

Dr. Johnson himself is currently participating in a Phase III randomized investigation and study of the proposed treatment. He acknowledges that two such studies are underway to determine the efficacy of the proposed treatment. . . . Dr. Johnson did not inform the committee of, nor is HAPI aware of, any completed Phase III trials evaluating HDC/ABMT or HDC/PBSCT. . . .

The Phase III trials currently being conducted, of which Dr. Johnson is a participant, are designed to compare the medical results of the experimental therapy to a standard therapy for breast cancer. . . . The fact is that the medical efficacy of the proposed treatment is questioned and thus still under investigation in medically recognized and accepted research studies. . . .

Plaintiff argues that HAPI's conclusion was arbitrary, capricious, clearly erroneous and motivated by HAPI's conflict of interest. At the very least, plaintiff argues that the plan was ambiguous concerning whether HDC/PBSCR would be covered and that the Court should therefore construe the contract against HAPI and grant judgment in plaintiff's favor.

1. Interpretation of Exclusion

a. *Contra Proferentum*

Plaintiff asserts that because Exclusion 11 is ambiguous, the Court should apply the principle of *contra proferentum* (the practice of construing ambiguous terms against the

insurer), construe the contract against HAPI, and rule that the HDC/PBSCT is a covered procedure.

While the Tenth Circuit has not yet resolved whether the *contra proferentum* rule should apply to contracts governed by ERISA, *see Blair v. Metropolitan Life Ins. Co.*, 974 F.2d 1219 1222 (10th Cir.1992), it has held that ambiguities should be resolved in an insured's favor "consistent with basic trust principles." *Id.* In *Blair*, the court resolved an ambiguity in a policy in the insured's favor, but it specifically said it was not applying the rule of *contra proferentum.* Other circuits have applied the rule of *contra proferentum* to ERISA contracts. *See, e.g., Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1551 (11th Cir.1994); *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98, 107 (2d Cir.1991). Plaintiff argues that either applying *Blair* or the rule of *contra proferentum*, the Court should find an ambiguity concerning what the words "investigational," "unproven" and "educational" mean in the context of the Certificate of Coverage and resolve that ambiguity in her favor.[17]

b. Plaintiff's Interpretation of Exclusion 11

Plaintiff first argues that under the plan's language "experimental," "unproven," "investigational," and "educational" all mean the same thing, which is "not generally accepted by the medical community." If the drafters of the plan did not consider such terms synonymous, plaintiff asserts, they would have defined all of the exclusionary terms instead of just one. Plaintiff therefore claims that the only question for the Court to address on this point is whether HDC/PBSCR was generally accepted by the medical community.

If the Court attributes different meanings to the exclusionary terms in Exclusion 11, then plaintiff argues that at the very least, the terms other than "experimental" are ambiguous because they are not defined. In support of her argument, plaintiff cites *Wolf v. Prudential Ins. Co. of America*, 50 F.3d

793 (10th Cir.1995), *Dahl–Eimers v. Mutual of Omaha Life Ins. Co.*, 986 F.2d 1379 (11th Cir.1993), and *Pirozzi v. Blue Cross–Blue Shield of Virginia*, 741 F.Supp. 586 (E.D.Va. 1990). In *Wolf*, the court stated, "we are inclined to agree with the district court that the exclusion for 'experimental' treatment is ambiguous with respect to whether it excludes HDC/ABMT [for the treatment of breast cancer]." *Wolf*, 50 F.3d at 800. In *Dahl–Eimers*, the Eleventh Circuit held that "in the context of a major medical insurance policy, the term 'experimental,' and in this case the phrase 'considered experimental,' is ambiguous when it is undefined." *Dahl–Eimers*, 986 F.2d at 1383. The court also noted that the existence of differing interpretations of the term "experimental" provides further evidence of a genuine ambiguity. *Id.* In *Pirozzi* the court found that a policy excluding experimental procedures was ambiguous when the policy did not define "experimental" and did not explain what evidence would be used to demonstrate whether a particular treatment was "experimental":

> "[I]n the context of modern medicine, the term experimental seems clearly ambiguous on its face." Nowhere does the Plan define "experimental" or "clinical investigative," nor does it explain what quantum or type of evidence is required to demonstrate that a treatment is not experimental. More specifically, nothing in the Plan requires that a treatment be successfully evaluated using a particular type of test, or that a treatment demonstrate a particular threshold of statistical success in terms of a cure or survival rate.

*Pirozzi*, 741 F.Supp. at 589–90 (citation omitted). Plaintiff asserts that such is the case here—that the undefined terms in Exclusion 11 are ambiguous because the policy does not explain what quantum or type of evidence is required for the procedure to be excluded as "unproven," "investigational," or "educational." Indeed, the Court notes that the exclusionary language does not set forth such

17. HAPI cites *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150, 153–54 (8th Cir.1990), in which the court found that the rule about construing contracts against the insurer is a principle of state law preempted by ERISA and that courts should construe disputed language without deferring to either party's interpretation. The First and Seventh Circuits have taken the same point of view as the Eighth. *See Allen v. Adage, Inc.*, 967 F.2d 695, 701 (1st Cir.1992); *Hammond v. Fidelity and Guar. Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir.1992).

indicia for determining whether a particular procedure is "experimental" or "generally accepted by the medical community" either, other than to indicate that HAPI is vested with discretion to make such determination.

What distinguishes the HAPI policy from the policies at issue in *Wolf*, *Dahl–Eimers*, and *Pirozzi* is its grant of discretion to the fiduciary to determine whether, in the fiduciary's judgment, the procedure is considered experimental (not generally accepted by the medical community), unproven, obsolete, investigational or educational. This feature dispels the ambiguity that, for example, the *Dahl–Eimers* court found in the policy's silence regarding who would determine what was "experimental." This difference also results in the Court's application of an arbitrary and capricious standard of review to HAPI's coverage decision, whereas the courts reviewing the plan administrators' decisions in *Wolf*, *Dahl–Eimers* and *Pirozzi* each conducted a de novo review. As the *Pirozzi* court cautioned:

> Worth noting here is the modest breadth of this decision. It is not a green light signalling a general expansion of coverage under group health policies like the Plan. Rather, this decision is narrowly, but firmly, anchored in the specific expert medical testimony presented and in the terms and structure of the Plan's experimental exclusion provision. Of course, a different experimental exclusion, or different expert testimony, or a plan that conferred broad discretion on the administrator might well require a different result.

*Pirozzi*, 741 F.Supp. at 594. The Court finds that *Wolf*, *Dahl–Eimers* and *Pirozzi* are not controlling because the exclusionary language in the subject policies are quite different from HAPI's policy, because the testimony in this case was apparently quite different from the testimony in those cases, and—most importantly—because HAPI's plan confers discretion upon the fiduciary to determine what is considered experimental, investigational, unproven, obsolete, or educational. Even if the Court were to find that the exclusionary terms other than "experimental" were ambiguous because Exclusion 11 failed to define them, as discussed below, the Court does not agree with plaintiff that HAPI abused its discretion in finding that HDC/PBSCR was considered experimental.

### c. Common and Ordinary Meaning

A lack of definition of contract terms does not require a finding of ambiguity. *See Motley*, 834 F.Supp. at 1277 n. 5. The objective in construing the policy is to "ascertain and carry out the true intentions of the parties" by "giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." *McGee v. Equicor–Equitable HCA Corp.*, 953 F.2d 1192, 1202 (10th Cir.1992). "[W]ords cannot be written into the agreement imparting an intent wholly unexpressed when it was executed." *Id.* (quoting *Wood River Pipeline Co. v. Willbros Energy Servs. Co.*, 241 Kan. 580, 738 P.2d 866, 871 (1987)). "[A] court should not eschew the interpretation of the terms of the agreement itself which will likely resolve the validity of claims." *Pitman v. Blue Cross & Blue Shield of Oklahoma*, 24 F.3d 118, 123 (10th Cir.1994).

The terms in Exclusion 11 are not complicated legal jargon, but plain words used frequently in everyday English. To ascribe to each of them the same meaning, or to pretend that their meanings are inscrutable to policy beneficiaries because the policy fails to set forth a legal definition of each term, would be to exercise inventive powers for the purpose of perverting the plain meaning of the exclusion and creating an ambiguity out of whole cloth where none would otherwise exist. Plaintiff's theory that all exclusionary terms carry the same meaning is further undercut by the fact that the drafters also included the word "obsolete" in the exclusionary clause. Since "obsolete" is the direct opposite of experimental, unproven and investigational in the context of medical procedures, the Court simply cannot accept plaintiff's theory that all of the exclusionary words in Exclusion 11 mean the same thing. Moreover, even if the Court were to interpret Exclusion 11 to exclude from coverage only those procedures which were not considered generally accepted by the medical community, as determined by HAPI, the Court would

reach the same result in this case as that it reaches below.

We "construe terms in trust agreements without deference to either party's interpretation," *Firestone*, 489 U.S. at 112, 109 S.Ct. at 955, and in accordance with "common sense canons of contract interpretation," *Burnham v. Guardian Life Ins. Co. of America*, 873 F.2d 486, 489 (1st Cir.1989). " 'Contract language in an ERISA plan is to be given its plain meaning.' " *Bartlett v. Martin Marietta Operations Support, Inc. Life Ins. Plan*, 38 F.3d 514, 517 (10th Cir. 1994) (quoting *Rodriguez–Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 586 (1st Cir.1993)). The Court finds that, giving the words in the Certificate of Coverage their plain meaning, the contract is not ambiguous. Therefore the Court need not construe the policy in either party's favor, and it need not resolve whether the *contra proferentum* rule should apply to contracts governed by ERISA. We turn now to the question whether HAPI made its determination arbitrarily and capriciously.

2. Conflict of Interest

There is an inherent conflict of interest when an insurance carrier both issues a policy and administers it. *Pitman*, 24 F.3d at 123. The Court must examine the conflict of interest and lower the level of deference accorded to the plan administrator's decision under the arbitrary and capricious standard proportionately. The Tenth Circuit has adopted a "sliding scale" approach to this analysis, under which "the reviewing court will always apply an arbitrary and capricious standard, but the court must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict." *Chambers*, 100 F.3d at 825 (10th Cir.1996).

The arbitrary and capricious standard has been defined many different ways. The Tenth Circuit has said that "lack of substantial evidence and a mistake of law would be indicia of arbitrary and capricious actions and thus may be subsumed under the arbitrary and capricious label.... Other potential indicia of arbitrary and capricious actions include bad faith or conflict of interest by the

fiduciary." *Sandoval*, 967 F.2d at 380 n. 4 (citations omitted).

Plaintiff does not argue that HAPI made a mistake of law; rather, she argues that HAPI lacked substantial evidence on which to base its decision to deny coverage for plaintiff's HDC/PBSCR. She argues further that the decision of HAPI and its Board members was influenced by their conflict of interest. She also intimates that HAPI demonstrated its bad faith by searching only for sources which would support its denial of coverage and disregarding evidence which would rebut its decision.

The Court finds that HAPI based its decision on substantial evidence. At the time it made its "final coverage decision," HAPI had available the following information:

(1) The 1993 and 1994 *Hayes Reports* indicated that HDC/PBSCR was still considered experimental and investigational by the medical community and the federal government. The 1993 report rated the procedure as investigational and/or experimental for the treatment of all forms of breast cancer. Under the heading of "Medical Consensus," the report states that "[w]hether high-dose therapy followed by PBSCT ... is superior to intensive chemotherapy without stem cell support must be addressed in further prospective, randomized, controlled clinical trials." The 1994 report rated the use of HDC/ PBSCT as investigational and/or experimental for treatment of Stage II breast cancer.

(2) The Health Care Finance Administration, which administers Medicare and Medicaid programs, considered the procedure experimental and investigational and did not cover the procedure.

(3) The consent forms used by the University of Kansas Medical Center, HAPI's approved transplant facility, indicated that HDC/PBSCT for treatment of Stage II breast cancer is currently the subject of research to see if it provides a benefit. The University of Kansas Medical Center's Division of Oncology advised HAPI that it "still considered [the procedure] investigational."

(4) The consent form that Dr. Johnson used in his own study stated that "The procedure here at issue is called 'peripheral blood stem cell transplant'. . . . The purpose of the study is to determine if giving high-dose chemotherapy will prevent the disease from recurring." The consent form also states that one-half of the participants in the study will receive standard chemotherapy, while the other half will receive HDC/PBSCT; the form explains that "[i]t is not known which of these treatments is better."

(5) Various legal opinions provided by plaintiff's lawyers and discovered by HAPI, some of which approved and some of which rejected ERISA denials of coverage, discussed the subject treatment.

(6) Dr. Adelson rendered his opinion that HDC/PBSCR was in an experimental/investigational stage of development. Dr. Adelson noted that Phase III studies of this treatment on women with Stage II and Stage III breast cancer were currently underway, and he stated that only through these randomized trials can the comparative safety, efficacy and value of high dose therapy be determined.

(7) HAPI consulted Dr. Doolittle, an oncologist at the University of Kansas Medical Center, who did not believe that the procedure would be experimental for treatment of breast cancer if the cancer showed a clear response to the initial chemotherapy, which he described as a 50% shrinkage in the tumor size. As mentioned above, plaintiff's tumor was surgically removed, so no information was available as to whether she had demonstrated a clear response to her initial chemotherapy.

(8) HAPI also contacted Dr. Lee, an oncologist at the University of Maryland, who noted that the procedure was currently the subject of a Phase III study. He stated that no randomized studies had yet been completed, but he felt that the procedure was "absolutely reasonable" and "should be accepted a standard of care."

(9) HAPI consulted two Wichita oncologists—Dr. Moore and Dr. Kim—who were not affiliated with Dr. Johnson's group. Both of them indicated that they believed HDC/PBSCR was still experimental and investigational, and was not yet generally accepted for use in the treatment of breast cancer.

(10) Michigan Blue Cross/Blue Shield considered the procedure experimental/investigational. Blue Cross/Blue Shield of Kansas did not consider the procedure experimental and stated that their coverage of it would depend upon medical necessity.

(11) The National Cancer Institute sent HAPI listings of various clinical trials underway for the investigation of PBSCT for the treatment of breast cancer.

(12) HAPI consulted the 1994 edition of *Conn's Current Therapy*, which listed the "Latest Approved Methods of Treatment for the Practicing Physician." The only mention of the use of HDC/PBSCT was for the treatment of metastatic breast cancer, and it stated that "[t]he preliminary data are encouraging, but the data from the controlled trials currently under way are not yet available."

(13) A June 1994 newsletter from Allianz, HAPI's reinsurer, stated that Allianz still considered HDC/PBSCR to be investigational and experimental in nature. Allianz used a different test than HAPI for what it considered experimental, including whether Phase III studies had been undertaken.

(14) A May 1994 Bone Marrow Transplant newsletter, recommended to HAPI by the American Medical Association, stated that "researchers have been investigating whether administering very high doses of chemotherapy followed by . . . a peripheral stem cell transplant . . . can cure or prolong survival for Stage IV metastatic breast cancer patients, as well as Stage II and Stage III breast cancer patients at high risk or relapse."

(15) Dr. Johnson, plaintiff's oncologist, testified that in recommending HDC/PBSCR for treatment of plaintiff's cancer, he relied heavily on a 1991 article by William Peters entitled "High–Dose Chemotherapy and Autologous Bone Marrow Support for Breast Cancer." That article concludes that in some cases HDC with stem cell support produces quick and de-

sirable results; however, "this is not the case for all patients, and research needs to be directed toward identifying the appropriate sub-groups capable of responding to this therapy." A 1993 article by the same author concludes that HDC with stem cell support for women with Stage II breast cancer reduces the frequency of relapse, but also states that "[e]valuation in a prospective, randomized trial is warranted and currently underway."

Plaintiff complains that HAPI failed to seek opinions of oncologists, relying instead on the Patient Care Committee and Board members whose expertise lay outside the field of oncology to determine what was generally accepted medical care for the treatment of breast cancer. The Court finds no abuse of discretion in the grievance procedure or the review process provided by HAPI's Certificate of Coverage, nor does the Court believe that each insurance claim must be reviewed by a physician specializing in the area of medicine involved in the claim. The record demonstrates that HAPI invested a great deal of time and effort gathering and reviewing information from reputable and pertinent sources. Moreover, plaintiff's charge that HAPI did not consult oncologists in determining plaintiff's coverage is untrue. Plaintiff's assertion that HAPI searched only for sources which would support its denial of coverage likewise lacks support in the record, and the Court finds that such assertion is without merit.

Although plaintiff has marshaled substantial evidence to controvert the Board's determination and to support her claim that HDC/PBSCR was generally accepted in the medical community, the nature of cutting-edge medical technology is that opinions may differ as to whether a certain procedure has crossed the threshold from experimental, investigational, unproven or educational to general acceptance by the medical community

and demonstrated efficacy.[18] It therefore is eminently reasonable to the Court that HAPI set forth in its Certificate of Coverage a procedure for determining whether that threshold had been crossed in a given situation and identifying who would make that determination. The Court cannot find, based on the record in this case, that HAPI's determination constituted an abuse of discretion. To the contrary, the Court believes that HAPI's determination was based on sound and voluminous evidence on which HAPI deliberated carefully.

The Court cannot avoid the question, however, whether and to what extent the conflict of interest under which HAPI exercised its discretion influenced its decision. A financial conflict of interest undoubtedly existed in this case. There is no evidence that defendant applied any pressure its staff or Patient Care Committee, however, to effectuate a denial of coverage. There is similarly no evidence that defendant considered or discussed during the grievance process the likely cost of the procedure or who would have to pay for it. Pursuant to federal regulations, an insurance company subject to state regulations is deemed to be an adequate fiduciary for the purpose of reviewing claim denials, and such companies are deemed by ERISA to be capable of carrying out a full and fair review of their decisions to deny benefits, even in situations where a conflict of interest is found to exist. *Motley v. Metropolitan Life Ins. Co.*, 834 F.Supp. 1272, 1281 (D.Kan.1993). There is simply no evidence that HAPI did not conduct such a full and fair review, and plaintiff has not demonstrated that Board members or others who reviewed plaintiff's claim were motivated by a desire to enhance their personal or corporate financial position at plaintiff's expense.

---

18. As the Peters article on which Dr. Johnson relied in recommending HDC/PBSCR for treatment of plaintiff's cancer points out:

Despite the availability of more than 25 agents effective in the treatment of breast cancer, the optimal therapeutic approach remains a subject of controversy and conceptual dispute. Disagreement among experts in the field is often as fundamental as whether or not the disease is ever curable. Varying perceptions of the relative importance of patient selection, end points evaluated, and the tradeoffs between toxicity and efficacy lead to major differences in therapeutic approaches among practicing physicians, centers, regions of the country, and countries.

Plaintiff's Exh. 23 at 135.

*Conclusion*

After careful consideration of the facts and the law, this Court has determined that despite the limited conflict of interest under which the Board members made their final coverage decision on plaintiff's claim, their actions were reasonable. Although the Court sympathizes deeply with plaintiff's situation and may well have decided the issue differently based on the substantial evidence which plaintiff presented to HAPI in support of her claim for coverage, the Court cannot find on this record that HAPI's decision was arbitrary and capricious under the standard of deference set forth in *Chambers*.

**IT IS THEREFORE ORDERED** that *Healthcare America Plans, Inc.'s Motion in Limine,* (Doc. # 80) filed June 20, 1996, be and hereby is sustained.

**IT IS FURTHER ORDERED** that in Case No. 94–1327 declaratory judgment be entered in favor of plaintiff Healthcare America Plans, Inc.

**IT IS FURTHER ORDERED** that in Case No. 94–1434 plaintiff Constance A. Bossemeyer's claim is overruled in its entirety.

**IT IS FURTHER ORDERED** that, since she has not prevailed on any of her claims in these cases, plaintiff Constance A. Bossemeyer's request for attorneys' fees and costs be and hereby is denied.