Sarah **CLAUSEN**, Plaintiff,

v.

**STANDARD INSURANCE COMPANY,**
Defendant.

**Civil Action No. 96–K–1676.**

United States District Court,
D. Colorado.

April 29, 1997.

---

Chris R. Noel, Boulder, James L. Noel, Englewood, CO, for Plaintiff.

Clinton P. Swift, Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Plaintiff challenges insurance company's rejection of her claim for long-term disability benefits under employer's ERISA-based plan. Plaintiff contends the denial was arbitrary and capricious in that the decision of the insurer, also the ERISA plan administrator, was not supported by substantial evidence, ignored objective medical evidence supplied by her treating physicians, and misapplied the law.

The parties argue their respective positions on cross-motions for summary judgment. As I explain in Part III, *infra,* Rule 56 provides an inappropriate vehicle for considering the issues raised. I treat this matter as a judicial review of an administrative record to determine whether the denial of benefits was arbitrary and capricious. In doing so, I reverse.

## I. *FACTS AND PROCEDURAL HISTORY.*

Plaintiff Sarah Clausen, who is 47 years old, worked for Children's Health Corporation (CHC) at its Northwest Satellite office in Arvada, Colorado, from October 1987 until December 1993. As an employee of CHC, Clausen was covered by a long-term disability benefits plan provided by CHC pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 (ERISA) (the "Plan"). Standard Insurance Company sold the Plan to CHC in 1982, and is both the insurer and the Plan's claims administrator for the purposes of 29 U.S.C. § 1002(21)(A). (R. Vol. IB, CLS 558 [1].)

The Plan provides for benefits payable by Standard 180 days after a participant submits proof of disability. (R. Vol. 2A, CLS 567, 874, 1685, 1708). One is "disabled" under the Plan "if, as a result of Sickness, Injury or Pregnancy, [one is] unable to perform with reasonable continuity the material duties of [one's] own occupation." (R. Vol. IB, CLS 567.)

The record indicates Plaintiff Sarah Clausen was diagnosed with hypothyroidism in 1979 and mild asthma in 1986. She had a cystoscopy in 1975, a laparoscopy in 1978, and a tubal ligation in 1988. After a hysterectomy and excision of some vulvar tissue in 1990, Clausen began experiencing chronic pelvic and pudendal pain.

In November 1991, Clausen suffered from a viral or flu-like illness which she claims never really went away. The symptoms noted by her treating physician at the time, Dr. Linda C. Wright, M.D., included recurrent fevers with chills, sore lymph nodes and sore throats without any documented bacterial infection, fatigue and general myalgias (pain) she did not have before, as well as food and chemical sensitivities she did not have before. *See* 10/27/93 Letter of Treating Physician, Linda C. Wright, M.D. (R. Vol. IB, CLS 493–94); 9/27/94 Letter of Mary Lee Beckman, M.D. (R. Vol. 2B, CLS 1119–20).

In January 1993, CHC installed new carpet at the satellite office. Clausen began experiencing respiratory problems and a worsening of her asthma she thought might be related to the new carpet and the repainting of the office with latex paint in March 1993. Before then, her asthma had been easily controlled with an inhaler. Clausen notified CHC and filed a Worker's Compensation Claim related to the paint on April 1, 1993 (R. Vol. IB, CLS 508) and a Worker's Compensation Claim relating to the carpet on April 29, 1993. (CLS 508.)

She was seen by David Thekan, R.N., of CHC's Employee Health Services, who referred her for evaluation to Dr. Jarvis, an

---

1. The "CLS" designation refers to the bates stamp numbers on pages in the Record.

Occupational and Environmental Medicine specialist at the National Jewish Center for Immunology and Respiratory Medicine. (R. Vol. IB, CLS 510.) In his July 21, 1993 report, Dr. Jarvis concluded Clausen's symptoms were consistent with sick building syndrome, but determined more extensive information about her workplace environs would be necessary to document such a diagnosis. (*Id.* at CLS 504–05.)

During this same time period, Clausen was referred by her treating gynecologist Michael Halgrimson, M.D. to gynecological oncologist Helen Fredrickson, M.D. for evaluation of her pudendal pain. (R. Vol. IB, CLS 374–75). Clausen complained of continued chronic pain and inability to sit for prolonged periods. *See* Letter from Fredrickson to Halgrimson (R. Vol. ID, CLS 374–75). While Dr. Fredrickson agreed Clausen may have some nerve irritation, she recommended against treatment. Dr. Fredrickson noted Clausen's medical history and breathing problems at work and attributed a "large component" of her pain to "psychiatric overlay." (*Id.* at CLS 374.)

In August 1993, Clausen took leave from her job as a result of her respiratory problems. CHS admitted liability for worker's compensation medical and temporary total disability benefits, and Clausen received payments for a period of three weeks from CHC's worker's compensation insurer. General Admission of Liability (R. Vol. IB, CLS 490). In September 1993, when Clausen declined a transfer to an office in CHC's central Denver building, these benefits were terminated. *See* 9/16/93 Letter from Sr. Claim Serv. Rep. Morrison to Clausen (*id.* at CLS 507).

Clausen filed a Leave of Absence request on September 21, 1993 (R. Vol. IB at CLS 512), supported by the recommendation of her long-time treating physician, Linda Wright, M.D. (*Id.* at 511). Dr. Wright indicated Clausen was able to work and perform the functions of her position, but stated her current workplace was "exacerbating [her] pulmonary disorder" and that the central Denver worksite proposed by CHS as an alternative "would be too far of a commute." (*Id.*)

When her medical leave benefits ran out in December, Clausen filed for long-term disability benefits under the Plan. *See* LTD Claim Employee's Statement (R. Vol. IB, CLS 484–89). Clausen claimed the "indoor air pollution at work" had required her to take increasingly greater quantities of asthma medications daily and heightened her sensitivity to chemicals that had not previously triggered breathing problems. *See id.* She claimed her difficulties in breathing and the side effects of the medications exacerbated her chronic fatigue symptoms, causing a relapse of CFS. As part of her filing, Clausen submitted an Attending Physician's Statement from Dr. Wright as well as the July 1993 report of Dr. Jarvis. She also identified nine attending physicians other than Dr. Wright from whom she had received treatment between 1988 and 1993.

Dr. Wright's Attending Physician's Statement related a diagnosis of "chronic fatigue, asthma, myalgias, pudendal nerve irritation, [and] allergy," and recommended Clausen stop working because of the "marked worsening" of her symptoms after the carpet was replaced and the walls repainted "which decreased when away from work." (R. Vol. IB at CLS 491–92.)

Dr. Wright expanded on her assessment of Clausen's work limitations in a letter she attached to the Physician's Statement. (R. Vol. IB at CLS 493–94.) The letter, dated October 27, 1993, detailed Clausen's treatment history and stated Clausen's sensitivity to chemicals found in newly remodeled buildings, air pollution, perfumes, and cleaning solutions "dramatically limits" the environments in which she is able to function. Dr. Wright stated that while Clausen's asthma had improved since taking leave from CHC in August, her fatigue had persisted. She also enclosed additional laboratory studies related to Clausen's CFS diagnosis "as per some of the chronic fatigue syndrome literature."

On January 28 and February 2, 1994, Standard requested medical records from all 10 attending physicians Clausen had identified in her LTD claim. Standard referred these records and Clausen's file to its Medical Di-

rector, Dr. Bradley Fancher, on February 23, 1994 for a medical review of the CFS diagnosis. (R. Vol. IA, CLS 127.)

In a memo dated March 1, 1994, Dr. Fancher stated that "[d]espite the multiple evaluations [Clausen] has undergone, and the narrative report [of] Dr. Wright ... I still find it difficult to understand the nature of [her] impairment." (R. Vol. IA, CLS 126.) Dr. Fancher stated he did "not think [Clausen] has classic chronic fatigue syndrome," and found her respiratory complaints to have been "out of proportion to what has been objectively documented." *Id.* He concluded it would be "worth her while to obtain a psychiatric IME and ... an internal medicine IME" with an academic internist or one with a subspecialty in pulmonology. *Id.*

Standard scheduled a psychiatric IME with Dr. Jeffrey Metzner for March 23, 1994. (R. Vol. IA, CLS 116–118.) Dr. Metzner interviewed and evaluated Clausen, reviewed her medical records, consulted with Dr. Wright, and prepared a six-page report.[2] (CLS 86–91.) Dr. Metzner described Clausen's medical history as "very complicated" and "consistent" with the diagnoses of Drs. Wright and Jarvis that Clausen suffered from chronic fatigue syndrome and that sick building syndrome had been considered in the differential diagnosis regarding her respiratory symptoms. (CLS 90.) Dr. Metzner's psychiatric examination indicated Clausen's symptoms "could be completely explained by chronic fatigue syndrome although some of the symptoms could also be consistent with the presence of a depressive disorder." *Id.* Emphasizing that his opinion was based on the assumption that the diagnoses of chronic fatigue syndrome and chemical sensitivities were accurate, Dr. Metzner rejected the latter and concluded Clausen was not "experiencing any functional impairments related to the presence of a psychiatric disorder." *Id.*

Next, Standard scheduled an Internal Medicine IME with Dr. Kent Christopher for the evaluation of Clausen' 5 respiratory status. (R. Vol. IA, CLS 83.) Dr. Christopher examined Clausen on May 18, 1994 and ordered various diagnostic tests that were performed in late May and June. *See* History and Physical (CLS 11–13); Tests (CLS 15–27, 28–33, 44–45). In his final report issued on August 2, 1994, Dr. Christopher stated Clausen' 5 physical examination was entirely normal with respect to her chest and stated her pulmonary function was also normal. Results indicating some bronchial hyperreactivity were attributed to "poor effort" during the exercise test or inappropriate medication administration. Dr. Christopher found "no evidence of a severe, disabling chronic lung disease" and concluded that any airway hyperresponsiveness or asthma was "very mild" and controllable with minimal inhaled medications. (R. Vol. 2B, CLS 1140–41.)

Also on August 2, 1994, Standard received a Physical Capacities Questionnaire (PCQ) completed by Dr. Wright. Dr. Wright reported that, in an eight-hour workday, Clausen could only sit for 3 hours, stand for 1/2 hour and walk for 1/2 hour. (R. Vol. 2B, CLS 1090–92.) She also stated Clausen must lie down 3 times a day for 2 hours. (*Id.* at CLS 1091.)

By letter dated September 19, 1994, Standard notified Clausen there was insufficient objective medical evidence at the time to support a disability claim, but that it was sending her file to an infectious disease specialist for review. (R. Vol. IA, CLS 5.) Citing the length of time Clausen's claim had been pending, Standard stated it would "begin sending [her] a payment of $1,000 per month by exception." *Id.*

On September 28, 1994, Standard asked Dr. Timm Edell to conduct an Independent File Review of Clausen's file, specifically instructing him to complete an enclosed Chronic Fatigue Syndrome Questionnaire. Dr. Edell is an infectious disease and internal medicine specialist, and a colleague of Dr.

---

2. As part of his evaluation, Dr. Metzner also asked Clausen to submit to a Minnesota Multiphasic Personality Inventory—2 (MMPI–2) administered by Antoinette Anker, Ph.D. (CLS 80–81.) Dr. Anker interpreted Clausen's MMPI–2 as demonstrating prominent "histrionic features" "strongly enforced" by Clausen's chronic distress, confusion, malaise, and lassitude. (CLS 80.)

Fancher.[3] In his October 13, 1994 report, (R. Vol. 2B, CLS 1136–39 at 1136), Dr. Edell found

> no[ ] objective laboratory documentation of pathology that correlates with the degree of functional limitations described by Ms. Clausen. Most all of her laboratory studies are normal or negative and, from what I can review in the chart, her complaints are primarily subjective and documented also by her primary care physician as being present, but there is no[ ] laboratory or other correlation present to explain her symptomatology. I do think that psychological, emotional, or psycho-social factors contribute to her physical complaints.

However, Dr. Edell also found Clausen "ha[d] many of the criteria present that would meet the Center for Disease Control (CDC) definition of chronic fatigue syndrome" and that, "by the reports in here, many of the other common causes of fatigue have been ruled out." Stating it was "difficult" for him to determine from Clausen's chart "whether or not she absolutely meets" the CDC definition, Dr. Edell suggested that Dr. Wright fill out a CFS report to "see if she, based on her continued care of Ms. Clausen, can demonstrate that Ms. Clausen meets the minor and/or physical criteria" for CFS. (R. Vol. 2B, CLS 1139.)

Dr. Wright completed the recommended report on October 21, 1994, checking off on Clausen's behalf all major and minor criteria for CFS, as well as two of three physical criteria. (R. Vol. 2B, CLS 1087–88.)

Thereafter, Standard received numerous additional medical records from doctors Clausen had seen in the spring and summer of 1994. These records included the reports of Dr. Mary Lee Beckman of Swedish Medical Center, to whom Clausen had been referred by Dr. Wright for a second opinion regarding her Chronic Fatigue Immune Dysfunction Syndrome diagnosis, (R. Vol. 2B, CLS 1119–20); National Jewish staff physician James F. Jones, M.D. (R. Vol. 2B, CLS 964–68); and neurologist Stanley G. Strauss (CLS 975–77), to whom Clausen had been referred by Jones for an evaluation of her

balance difficulty. Also submitted was the Physical Capacities Evaluation Report completed by Clausen's treating chiropractor, Dr. Dale A. Hameister, dated July 7, 1994, which indicated Clausen could only sit and walk for a total of 1 to 2 hours and stand for 1/2 hour during an 8–hour work day. (CLS 1023–24.)

Dr. Beckman saw Clausen on April 27, 1994. She took Clausen's history and examined her. She did not review Clausen's laboratory work because it had not been made available. Dr. Beckman found Clausen met three out of three of the major criteria for CFS and six out of ten minor criteria. (R. Vol. 2B at CLS 1120.) Based on the assumption that other illnesses and/or primary psychiatric illnesses had been ruled out, Dr. Beckman concluded Clausen was suffering from Chronic Fatigue Immune Dysfunction Syndrome. (*Id.*)

Dr. Jones saw Clausen in June and July 1994. He ordered and evaluated numerous pulmonary and other tests, and referred Clausen to a neurologist and sleep physician for consultation. Based on these tests and consultations, Dr. Jones arrived at a "working" and "open" diagnosis of chronic fatigue syndrome resulting in Clausen being "unable to work." (*Id.* at CLS 968.) Dr. Jones stated "an attempt will be made to provide her with nonspecific intervention" and "suggestions regarding the use of regular, but limited exercise," but concluded Clausen "remains disabled from this condition in part because of its unpredictability and because of how it prevents her from being a reliable working person." *Id.*

At the sleep physician's suggestion, Clausen participated in a sleep study at National Jewish on September 18, 1994, to rule out a sleep disorder as the cause of her fatigue. (R. Vol. 2B, CLS 1025.) The study revealed the presence of marginal sleep quality, but no evidence of a disorder. Other than improving her "sleep hygiene" and foregoing naps in the afternoon, no therapeutic interventions were deemed warranted. *Id.*

Dr. Wright had also referred Clausen to Dr. John Slocumb, a professor of obstetrics

---

**3.** It is unclear from the record whether Dr. Edell   was also a member of Standard's medical staff.

and gynecology with University Hospital's Pelvic Pain Clinic, in June 1994 for evaluation of her pelvic and vulvar pain. (R. Vol. 2A, CLS 836–37.) Dr. Slocumb found a pudendal neuropathy, possibly secondary to injury at the time of her hysterectomy. Dr. Slocumb's report stated he was able to block, "pretty completely," the distribution of the pudendal nerve and therefore Clausen's pain with a local anesthetic, for which Clausen returned on a monthly basis. "As an aside," Dr. Slocumb found Clausen's "vulvar and pelvic pain components appear to be another manifestation of the same [chronic] fatigue syndrome." (CLS 836.)

In October 1994, Clausen saw Dr. Kevin Lillehei, a University Hospital Associate Professor of Surgery, for another evaluation of her pudendal pain. In a letter to Dr Slocumb dated October 12, 1994 (R. Vol. 2B, CLS 1081–82), Dr. Lillehei noted the pain blocks worked for only 24 hours at a time and recommended a different medication for Clausen's pain. He found her neurologic exam normal and recommended against any further studies or any surgical intervention. (*Id.* at CLS 1082.)

The neurologist consulted by Dr. Jones in June 1994 referred Clausen to Dennis Helffenstein, Ph.D, C.R.C., a neuropsychologist and certified rehabilitation counselor. Clausen was seen by Dr. Helffenstein on November 7 and 9, 1994 for testing. Dr. Helffenstein evaluated Clausen and her test results in a 10–page report dated November 17, 1994. (R. Vol 2B, CLS 992–1003.) Dr. Helffenstein found Clausen was "likely experiencing organically based cognitive deficits as a result of her Chronic Fatigue Syndrome" that were exacerbated by her fatigue and physical pain. (CLS 1002.) As a result of her cognitive dysfunction, Dr. Helffenstein stated Clausen was "extremely limited from a vocational standpoint":

When one considers her cognitive deficits and her physical problems (such as the multi-chemical sensitivity, physical pain, and hypersensitivity to light, sound, and temperature) in conjunction with the significant fatigue that she experiences, it is unlikely that Ms. Clausen would be able to successfully engage in any substantial gainful activity or employment.

*Id.* at CLS 1002.

Dr. Fancher reviewed the additional medical records in December 1994. In a half-page memo, Dr. Fancher acknowledged the "working" diagnosis of chronic fatigue syndrome by Drs. Jones and Helffenstein but stated it was "[his] opinion that neither Dr. Jones nor Dr. Helffenstein have taken into account the claimant's long history of having numerous somatic complaints but few objective findings." (R. Vol. 2B, CLS 950.) In Dr. Fancher's opinion, Clausen "likely suffers from a somatization disorder."[4] *Id.* Nevertheless, Dr. Fancher recognized this to be "in conflict with nearly all of the opinions which are provided in the chart by the claimant's attending physicians and consults" and he concluded the "'working diagnosis'" at that point in time should be CFS. *Id.*

In January 1995, Standard hired a private investigation service to "survey and interview" Clausen. The characterization is misleading. What Standard hired the investigator service to do was to attempt to prove Clausen a malingerer. The investigators videotaped Clausen secretly as she went about her daily routine, and then, without telling her she'd been followed and videotaped, interviewed her about her day in hopes of "catching" her in a lie. *See* Surveillance and Interview of Claimant (R. Vol. 2B, CLS 938–47).

According to the surveillance report, which reads like an episode of "Dragnet," the investigators "arrived in the area of the subject's residence" at 6:40 a.m. "and established a position of observation to the south and west of the subject's residence." (CLS 939.) The investigators videotaped Clausen walking her dog from 9:59 a.m. to 10:27 a.m. and recorded the odometer readings from their car showing the walk had been over 2 miles. At 10:45 a.m., Clausen left in her car and the investigators followed—videotape rolling. More videotape was taken of Clausen picking up an elderly woman (her mother) in Boul-

4. A "somatization disorder" is "the conversion of mental experiences or states into bodily symptoms." Dorland's Ill. Med. Dictionary (25th ed.) (W.B Saunders Co.1974).

der, shopping with her for an hour at Westminster Mall, having lunch at the Red Lantern Restaurant, and returning to the Mall for another hour of shopping. After Clausen left the Mall at 2:41 p.m., the investigators lost her vehicle in traffic and returned to her house. Clausen arrived at 4:23 p.m. After staking out the house for another 20 minutes, the investigators got out of their car and knocked on Clausen's door to conduct an interview.

The investigators identified themselves and stated they were assisting Standard Insurance in the processing of her claim. They asked Clausen questions about her daily routine and health, and obtained a signed a statement from her that she took her dog on walks "of approximately one mile 3–4 times per week," could only drive or sit for 1/2 hour at a time, and had to rest after getting ready in the morning. They did not tell Clausen they had followed her all day and had videotaped her taking her dog on a two-mile walk, leaving home 15 minutes later, driving to Boulder and back, having lunch, and shopping. In a memo to file dated January 26, 1995, Standard's claims adjuster determined the discrepancies between Clausen's statements and the video rendered her credibility "suspect." Babin Memo. (1/26/95) (R. Vol. 2B, CLS 934–35).

In early February, 1995, concerned Clausen's treating physicians were referred to her by members of her CFS support group and were biased to its cause, Standard scheduled Clausen for an Independent Neuropsychological Evaluation with Dr. Laetitia Thompson, Ph.D., an Associate Professor of Psychiatry and Neurology at the University of Colorado Health Sciences Center. Standard asked Dr. Thompson to determine whether Clausen's stated functional limitations accorded with any pathology or other objective data in her file and to administer an MMPI. Standard Ins. Memo. to Thompson (R. Vol. 2B, CLS 931, 933). She was also asked to review the tests conducted by Dr. Helffenstein and to review the videotape.

In her report dated March 8, 1995, (R. Vol. 2A, CLS 882–899) Dr. Thompson found Clausen's test results across the two evaluations suggested the presence of "very mild (possibly mild) fairly generalized cerebral dysfunction." (CLS 893.) However, Dr. Thompson also found Clausen had "many strengths that will enable her to compensate for the very mild weaknesses" in cognitive functioning and stated that, "from a neuropsychological perspective alone, I certainly think [her] employable." (CLS 895.) Dr. Thompson stated Clausen's complaints "seem to be greater than the findings on examination would suggests" but also stated factors beyond her expertise such as fatigue and psychological or emotional problems may affect Clausen's ability to work.

After reviewing Dr. Thompson's report and the report of the private investigators in May 1995, Dr. Fancher found there was "clear evidence" that Clausen had "exaggerat[ed] her degree of [mental and physical] impairment" and stated both reports suggested Clausen could work on a full time basis in a sedentary job without other restrictions. (R. Vol. 2A, CLS 878.) Dr. Fancher found it "very unlikely" that Clausen was suffering from chronic fatigue syndrome, and, even if she were, that it would prevent her from working full time. *Id.*

By letter dated May 19, 1995, Clausen was notified of Standard's decision to deny her claim. The letter set forth in detail the reason for the denial, including references to the specific plan provision on which the denial was based, the reports and opinions of Drs. Christopher, Fredrickson, Edell, Helffenstein, and Thompson, and the private investigators' report and surveillance video. *See* Letter (R. Vol. 2A, CLS 869–74). Standard acknowledged Clausen had been approved for Social Security Disability,[5] but stated it was not bound by the Social Security Administration's investigation or decision regarding Clausen's inability to engage in gainful activity or employment. (CLS 873.) Based on its own investigation, Standard found Clausen's stated limitations and re-

---

**5.** Clausen received a favorable decision on her claim for Social Security Disability on February

15, 1995. (R. Vol. 2A, CLS 855–58.)

strictions were supported by neither the objective medical testing nor the investigators' observations and concluded her impairments were exaggerated. *Id.* Standard's payments by exception ceased.

By letter dated June 8, 1995, Clausen, through counsel, submitted additional medical evidence regarding her pudendal neuropathy as well as copies of legal decisions and articles on the issue of chronic fatigue syndrome. (R. Vol. 2A, CLS 780–842.) In addition, counsel argued Dr. Jones's diagnosis of CFS had not been refuted by substantial evidence and stated the cognitive impairments documented by Drs. Helffenstein and Thompson were consistent with her inability to perform her teaching job. The videotape, the attorney argued, was nondispositive because the issue was Clausen's ability to do her job on a regular and sustained basis. (CLS at 781.)

On June 27, 1995, Clausen's claim file was returned to Standard's Quality Assurance Unit for review. (R. Vol. 2A, CLS 763.) During the course of this review, Clausen submitted additional medical records, including additional medical records, progress notes and letters from Drs. Jones, Wright and Hameister; records from Dr. Kendall Gerdes of the Environmental Medicine Associates; a critique of Dr. Thompson's independent psychoneurological evaluation by Dr. Helffenstein; and records from Dr. WA. Shrader, Jr., M.D., of the Santa Fe New Mexico Center for Allergy and Environmental Medicine. *See* Noel Letters of 6/9/95 (R. Vol. 2A, CLS 770), 6/29/95 (CLS 756), 7/19/95 (CLS 622), and 8/21/96 (CLS 617); Helffenstein critique (CLS 749–53).

Dr. Fancher reviewed these additional records in September 1995. In an October 2, 1995 memorandum, Dr. Fancher commented on the "unorthodox physicians" Clausen was seeing, stating the tests and therapies suggested by Dr. Shrader, in particular, lacked any scientific basis and "would be disregarded by the general medical community." (R. Vol. 2A, CLS 575). With regard to Dr. Thompson, Dr. Fancher stated it was still reasonable to rely on her report, but that he would send her Dr. Helffenstein's critique for comment. (CLS 576.)[6] As for Clausen's pelvic pain and stated inability to sit, Dr. Fancher relied on the surveillance video to conclude nerve irritation was not the source of any significant impairment. *Id.* Dr. Fancher failed in his October memo to address the additional materials received from Drs. Jones, Wright or Hameister. The omission is significant, particularly with regard to Dr. Jones's August 21, 1995 letter.

In his August 21 letter, Dr. Jones noted Clausen's ongoing complaints of persistent fatigue and described a positive "tilt table test"[7] he performed on Clausen on July 18, 1995. (R. Vol. 2A, CLS 619.) Jones described certain of Clausen's responses as "unusual," and stated further testing would be undertaken to confirm her evaluation. *Id.* Dr. Jones stated that "at this time, however," Clausen "fits the 1994 definition of chronic fatigue syndrome and that regardless of its origin, the symptoms and their consequences preclude her normal functioning." "The unpredictability of the problem," he concluded, "compounds the situation and adds to her inability to work." *Id.*

Based on Dr. Fancher's October 2, 1996 memo, Standard's Quality Assurance Unit notified Clausen that it had completed its review and would uphold the May 19 decision to deny her claim. *See* Letter dated 11/6/95 (R. Vol. 2A, CLS 559–61.) The Quality Assurance Unit found there was "insufficient medical evidence" to support Clausen's claim that she suffered from a "disabling sickness." (CLS at 561.)

---

6. Dr. Fancher did so, and by letter dated October 20, 1995 (R. Vol. 2A, CLS 570–71), Dr. Thompson reiterated her conclusion that Clausen was not disabled from employment. She also reiterated that this conclusion was based on Clausen's neurocognitive abilities alone. Dr. Thompson stated she did not, nor was it within the scope of her practice to do so, evaluate Clausen's physical symptoms or illnesses for disability purposes. (CLS 571.)

7. A tilt table test is a diagnostic test to detect neurally mediated hypotension, which is characterized by lightheadedness, diaphoresis, nausea, abdominal discomfort, blurred vision, and pallor. CFS is associated with neurally mediated hypotension.

Thereafter, Clausen's attorney submitted additional documents to Standard and urged it to reconsider. See Letter dated 4/16/96 (R. Vol. 3A, CLS 1226). These documents included Clausen's complete Social Security claim file; letters from Drs. Jones, Helffenstein, Wright, and Gerdes disputing the relevance of the surveillance video; lay witness statements of Clausen's daily activities; and a copy of the 1994 Working Case Definition of CFS adopted by the Center for Disease Control (CDC).

Dr. Fancher reviewed this additional information, agreeing there were "difficulties" in making inferences regarding Clausen's ability to work from a surveillance tape, but finding "the major information gleaned in this instance is that the claimant's own history is not reliable." 5/7/96 Fancher Mem. (R. Vol. 3A, CLS 1163). Because the videotape and the report of Dr. Thompson "refuted" Clausen's subjective statements as to her physical and cognitive mental impairments, Dr. Fancher maintained that Standard "need[ed] to rely on objective documentation of [Clausen's] impairment." *Id.* According to Dr. Fancher, Dr. Thompson's report and the videotape constituted the only such evidence and "lead to a reasonable belief that the claimant should be capable of performing full-time work if she was [sic] adequately motivated." *Id.*

By letter dated May 13, 1996, Standard advised Clausen's attorney that the initial decision to deny her disability claim would not change. (R. Vol. 3A, CLS 1162.) Clausen filed this lawsuit on July 16, 1996.

Clausen argues the denial of her claim was arbitrary and capricious in that it was supported by insubstantial evidence in the record. Standard disagrees. Both sides moved for summary judgment.

## II. *STANDARD OF REVIEW.*

Clausen's Complaint arises under 29 U.S.C. § 1132(a)(1)(B), which provides that ERISA-based plan participants may bring a civil action to recover benefits or to enforce their rights under the terms of the plan. In actions brought under § 1132(a)(1)(B), discretionary actions of a plan fiduciary are reviewed under an arbitrary and capricious

standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109–11, 109 S.Ct. 948, 953–55, 103 L.Ed.2d 80 (1989), *applied in Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 379–80 (10th Cir.1992) *and Chambers v. Family Health Plan Corp.,* 100 F.3d 818 (10th Cir.1996).

Standard relies on caselaw from the Sixth and Seventh Circuit Courts of Appeals to argue that where, as here, an ERISA-based plan gives an insurer discretion to determine entitlement to benefits, a reviewing court's inquiry under the arbitrary and capricious standard is limited to determining whether the insurer's decision "lacked a reasonable basis or was made in bad faith." Def.'s Br. Supp. Mot. Summ. J. at 19–20 (citing *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 983–4 (6th Cir.1991) and *Bali v. Blue Cross and Blue Shield Ass'n,* 873 F.2d 1043, 1047 (7th Cir.1989)). Claiming its decision to deny benefits in this case was "reasonable" and not an "abuse of discretion," Standard asserts it is entitled to judgment as a matter of Law. *Id.* at 2. I disagree.

In this circuit, a lack of substantial supporting evidence and mistakes of law are indicia of arbitrary and capricious conduct for the purpose of § 1132(a)(1)(B), as are bad faith or conflict of interest by the fiduciary. *Sandoval,* 967 F.2d at 380 & n. 4. Further where, as here, an insurer may promote the potential for its own profit by denying plan participants' claims, deference to its decision in a particular case will be lessened to the degree necessary to neutralize that conflict. *Chambers,* 100 F.3d at 826 (rejecting the "presumptively void" test applied in other circuits and reiterating the "sliding scale" approach to conflict situations suggested in *Pitman v. Blue Cross & Blue Shield,* 24 F.3d 118 (10th Cir.1994) (insurer's conflict of interest is but "a factor" to be considered in reviewing decision to deny benefits)).

In determining whether a plan administrator's decision was arbitrary and capricious, a district court generally may consider only the arguments and evidence available to the administrator at the time the decision was made. *Sandoval,* 967 F.2d at 380. Because a primary goal of ERISA

was to provide a method for workers and beneficiaries to resolve disputes over benefits expeditiously, a process that allowed district courts to consider evidence not presented to plan administrators would result in workers and their beneficiaries receiving less protection than Congress intended. *Id.* (quoting *Perry v. Simplicity Engineering,* 900 F.2d 963, 967 (6th Cir.1990)).

### III. *DISCUSSION.*

■ As an initial matter, I find summary judgment an inappropriate vehicle for evaluating the arbitrariness and capriciousness of an administrator's denial of disability benefits under ERISA. The nature and grounds of my opinion in this regard are set forth fully in *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1579 & n. 31 (10th Cir.1994) (Kane, J.), and will not be repeated here. Based on the standard of review articulated above, Standard's decision to deny Clausen long-term disability benefits will be upheld unless, taking into account Standard's conflict of interest, the decision was arbitrary and capricious.

Turning to the issues for review, Clausen contends the Administrator's determination was arbitrary and capricious because (1) it was not supported by substantial evidence in the record; and (2) it was premised on a misapprehension of applicable law. In the alternative, Clausen seeks de novo consideration of her claim in a bench trial on the issues of substantial evidence and applicable law. Under this alternative approach, Clausen asks that the parties be allowed to engage in formal discovery so they may supplement and refine the record.

#### *Substantial Evidence.*

An administrator's decision that is not supported by substantial evidence in the record may be arbitrary and capricious. *Sandoval,* 967 F.2d at 380, n. 4 (citing *Danti v. Lewis,* 312 F.2d 345, 348 (D.C.Cir.1962)). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Sisco v. United States Dept. of Health & Human Serv.,* 10 F.3d 739, 741 (10th Cir.1993) (social security appeal) (citing *Richardson v. Perales,* 402 U.S. 389, 390, 91 S.Ct. 1420, 1422, 28 L.Ed.2d 842 (1971)). Evidence is "substantial" if it is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact." *Olenhouse,* 42 F.3d at 1575.

■ Clausen contends there was insubstantial evidence in the record to support Standard's denial of her disability claim. Specifically, Clausen argues Standard undervalued or ignored medical evidence supplied by her treating physicians that support a diagnosis of chronic fatigue syndrome and relied instead on the surveillance video and subjective credibility determinations to deny her claim. According to Clausen, excessive weight was given to Standard's independent medical examiners and the subjective opinions of Dr. Fancher, while the opinions and records of her own treating physicians were ignored or improperly discounted. Clausen also argues that Standard improperly ignored the Administrative Law Judge's finding in her social security case that she was disabled and incapable of substantial gainful activity.

Given the uncontroverted medical evidence that Clausen suffered from CFS and the record before me, I agree.

The record in this case reveals no genuine issue of medical fact regarding the diagnosis of CFS. Dr. Wright diagnosed Clausen with CFS in 1992. During the following two years, Clausen was examined by at least five medical doctors, a neuropsychologist and two chiropractors. Sleep and psychiatric disorders were ruled out as possible causes of her fatigue and myalgias, as were chronic lung and other identifiable diseases. Dr. Wright's diagnosis was confirmed in a second opinion by Dr. Beckman in 1994 and supported by the opinion of neuropsychologist Dr. Helffenstein. Dr. Jones, a nationally recognized CFS expert, conducted his own evaluation of Clausen and arrived at an independent diagnosis of CFS. See Jones Report (R. Vol. 2B, CLS 964–68) ("working diagnosis") and Letter dated 8/25/95 (R. Vol. 2A, CLS 619) (confirming diagnosis based on year-long evaluation). Each of these physi-

cians stated Clausen's symptoms rendered her unable to work.

None of the independent examiners to whom Standard referred Clausen disagreed with the CFS diagnosis or diagnosed any other disease to explain her symptoms. Dr. Metzner, who conducted a psychiatric IME of Clausen in March 1994, stated Clausen's medical history was "consistent" with a diagnosis of CFS. (R. Vol. IA, CLS 90.) Dr. Edell, whom Standard retained to conduct an independent file review of Clausen's medical records, acknowledged CFS as a possible diagnosis and conceded "many of the other common causes of fatigue have been ruled out." (R. Vol. 2B, CLS 1136.)

As of December 19, 1994, Standard's own Medical Director concurred in a "working" diagnosis of CFS. See Fancher Memo. (R. Vol. 2B, CLS 950). It was not until the surveillance video and the receipt of Dr. Thompson's neurocognitive IME that Standard, through Dr. Fancher, began to distance itself from the CFS diagnosis and to focus its inquiry into "whether or not [Clausen] suffers from a physical illness." 10/2/95 Mem. (R. Vol 2A, CLS 575).

According to Dr. Fancher, the question of whether Clausen suffered from CFS "[would] not particularly help" Standard determine "whether or not [Clausen] has a physical illness." *See* 10/2/95 Mem. at 1 (R. Vol. 2A, CLS 575). He characterized the discrepancy between Standard's assessment of Clausen's illness and the assessments of her treating physicians as simply "a disagreement as to the reliability of [Clausen's] subjective complaints" and determined, based on the video and Dr. Thompson's report, that Clausen's complaints were "unreliable." *Id.* Recommending that Standard rely solely on "objective documentation of [Clausen's] abilities," Dr. Fancher concluded Clausen was "capable of performing sedentary work on a full-time basis." *Id.* at 2, (CLS 576). In reiterating its denial of Clausen's claim, Standard's Quality Assurance Unit adopted Dr. Fancher's recommendation verbatim. *See* Letters dated 11/6/95 (R. Vol. 2A, CLS 559, 561) and 5/13/96 (R. Vol. 3A, CLS 1162).

Standard's attempt to ignore the CFS diagnosis of Clausen's treating physicians and

to require, instead, that Clausen provide "objective" evidence of a distinct "physical disease" runs afoul of established law in this circuit. Further, the resulting determination that Clausen did not suffer from a physical illness and could work full-time is unsupported by substantial evidence in the record.

In *Sisco v. United States Dept. of Health & Human Serv.*, 10 F.3d 739, 741–44 (10th Cir.1993), the Tenth Circuit reversed an Administrative Law Judge's determination that a social security claimant was not disabled by CFS. The court found the ALJ improperly discredited the claimant's testimony and her treating physician's CFS diagnosis by "looking for some sort of conclusive 'dipstick' laboratory test" that showed claimant was suffering from a physical disease. *Id.* at 744. No such test exists for diagnosing CFS.

Instead, the medical community relies on an " 'operational' " diagnosis technique involving testing, the matching of a detailed list of symptoms, the exclusion of other possible disorders, and a thorough review of the patient's medical history. *Sisco*, 10 F.3d at 744. Because CFS is diagnosed partially through a process of elimination, the Tenth Circuit found that "an extended medical history of nothing-wrong' diagnoses is not unusual for a patient ultimately found to be suffering from the disease." *Id.* at 745. Based on the fact that claimant's treading physician had followed the CDC-recognized approach for diagnosing CFS, the Tenth Circuit found the ALJ's determination that claimant was capable of full-time work based on her history of "nothing-wrong" diagnoses and the lack of objective medical evidence of the disease was unsupported by substantial evidence. *Id.*, applied in *Rose v. Shalala*, 34 F.3d 13 (1st Cir.1994).

There is no dispute that Clausen's treating physicians followed the CDC approach for diagnosing CFS. Dr. Jones, who diagnosed Clausen with CFS during the course of a one-year period from 1994 to 1995, is a member of the International Chronic Fatigue Syndrome Study Group that developed the Working Case Definition of CFS adopted by the CDC. *See* Fukuda, Strauss, Hickie, Sharpe, Dobbins, and Komaroff, *The Chronic*

*Fatigue Syndrome: A Comprehensive Approach to Its Definition and Study*, Annals of Internal Medicine, Vol. 121, No. 12, pp. 953–59 (Dec. 15, 1994). Standard was apprised of Dr. Jones's qualifications and had been given his notes and findings before issuing its final decision in this case, and chose largely to ignore them. As a matter of law under *Sisco*, Standard's decision to ignore or discredit the CFS diagnoses and Clausen's treating physicians was arbitrary and capricious.[8]

Further, the conclusion that Clausen was not "disabled" as a result of CFS is unsupported by substantial evidence in the record. I have already stated that, under *Sisco*, the lack of "objective" medical evidence to "prove" Clausen was disabled by her fatigue or pain cannot constitute substantial evidence that Clausen was not disabled, i.e., that she was capable of full-time work. I now find in addition that neither the surveillance video nor Dr. Thompson's report constitutes such evidence.

The surveillance video documents one eight-hour period in Clausen's life. It shows Clausen walking two miles with her dog and driving her car. There is nothing in the record suggesting Clausen was capable of such activity on a sustained basis or that the video documented anything other than a good day or a special day visiting with her mother. Perhaps with the exception of Clausen's statement that she was unable to sit for more than 1/2 hour at a time, the video is not inconsistent with anything Clausen reported to Standard or to the doctors that evaluated her.[9] Further, the Plan at issue defines "disability" as being "unable to perform with **reasonable continuity** the material duties of your own occupation." (R. Vol. 2A, CLS 567.) The videotape bears little, if any, relevance to this standard.

Standard's reliance on the private investigators' report to suggest Clausen is a malingerer whose statements cannot be trusted is grossly exaggerated and unsupported by substantial evidence in the record. Standard's conflict of interest and the nature of the investigation it commissioned allow me to accord little weight to it upon review.

Nor does the neurocognitive IME of Dr. Thompson constitute substantial evidence that Clausen was not disabled. Dr. Thompson expressly limited her findings as being "from a neuropsychological perspective alone," and did not address factors affecting her ability to work such as fatigue or pain. *See* R. Vol. 2A, CLS 882 at 895 (these factors were "beyond [her] expertise" to consider). The fact Dr. Thompson was even asked to review the surveillance video—which could have provided no information relevant to Clausen's neurocognitive abilities—calls into question Standard's motives in seeking the IME and is probative of the conflict of interest to be considered as a factor on review. *See* Ins. Mem. (R. Vol. 2B, CLS 931, 932–33) (asking Dr. Thompson to evaluate Clausen's behavior and physical complaints and to "review the enclosed videotape").

Given the great weight of evidence that Clausen was "disabled" as that term is defined in the Plan, neither the surveillance video nor Dr. Thompson's report constitutes substantial evidence to support the denial of her claim under the Plan.

I find Standard's decision to deny Clausen long-term disability benefits under the Plan was arbitrary and capricious and reverse. I deny Standard's "Motion for Summary Judgment" and, because I rely on no evidence or arguments unavailable to Standard at the time it issued its final decision, I also deny Standard's Motion to Strike Plaintiff's Sup-

---

8. Standard argues *Sisco* is distinguishable because the Social Security Act contains a statutory definition of "substantial evidence" and applies a shifting burden of proof under 20 C.F.R. § 404.1520(b)-(f). The distinction is immaterial. The "substantial evidence" test defined in the Act is not substantively different from the one applicable here and the Act's burden-shifting analysis did not impact the Court's analysis in *Sisco*.

9. I take the sitting statement at face value: Clausen sat in her car for two round trips from Arvada to Boulder, a distance of less than 20 miles each way. While somewhat inconsistent with her own statement to the investigators that she could only sit for 1/2 hour at a time, the difference is negligible and is consistent with the Physical Capacities Questionnaires completed by Dr. Wright and others. *See* R. Vol. 2B, CLS 1090–92 (Dr. Wright), R. Vol. 2B, CLS 1023–24 (Dr. Hameister).

plemental Responses to Defendant's Statement of Material Facts. Because I rule in her favor, I do not address Clausen's alternative arguments regarding Standard's construction of its Plan.

IT IS ORDERED that Standard's decision to deny Clausen long-term disability benefits under the Plan is REVERSED. Judgment shall enter in favor of Clausen and against Standard, with costs on appeal to Clausen.