Karen **BROOKS**, Plaintiff,

v.

**THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA,**
**Defendant.**

No. CIV. A. 97–2026–GTV.

United States District Court,
D. Kansas.

Feb. 6, 1998.

Fred Spigarelli, Spigarelli, McLane & Short, Pittsburg, KS, for Plaintiff.

John J. Jurcyk, Jr., Paul K. Thoma, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, Defendant.

### MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

Plaintiff brings this lawsuit alleging that defendant improperly terminated her partial disability benefits. Plaintiff originally filed the action in the District Court of Crawford County, Kansas but defendant removed the case to this court pursuant to 28 U.S.C. § 1441 on the grounds that plaintiff's suit implicates the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et*

*seq.* The case is now before the court on defendant's motion for summary judgment (Doc. 30). For the reasons set forth below, defendant's motion is granted.

### I. Procedural Issues

Although plaintiff did not affirmatively assert an ERISA claim in her complaint, the court held in its Memorandum and Order denying plaintiff's motion to remand that ERISA preempted her cause of action. The nature of her case—recovery of benefits allegedly due under the terms of an ERISA plan—implicates the jurisdictional provision at 29 U.S.C. § 1132(a)(1)(B).

### A. Standard of Review

ERISA does not provide an express standard of review for courts to apply in a benefits dispute brought pursuant to 29 U.S.C. § 1132(a)(1)(B). The Supreme Court, however, in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110–12, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), held that the language of the plan under which a plaintiff seeks benefits determines the appropriate standard of review. If the plan grants no discretion to the administrator or fiduciary to construe plan terms or determine eligibility, a de novo standard applies. *Id.* 489 U.S. at 115. If, however, the plan bestows discretion upon the administrator or fiduciary to interpret plan terms or assess an individual's eligibility, an arbitrary and capricious standard applies. *Id.* Although a plan must impart discretionary authority in specific words, no particular terminology (such as "construe," "interpret," "deference," or "discretion") is required. *Caldwell v. Life Ins. Co. of N. Am.,* 959 F.Supp. 1361, 1365 (D.Kan.1997) (citations omitted).

Plaintiff concedes that the plan to which her employer subscribed vests the administrator with discretionary authority. She correctly points out, however, that defendant operates under a conflict of interest, thereby warranting a less deferential standard of review.[1] Plaintiff argues that the court should invoke the two-part "presumptively void" test articulated in *Brown v. Blue Cross & Blue*

1. Defendant does not dispute that the plan administrators operate under a conflict of interest. As this court recently noted, "[d]ecisions made by the issuing company on behalf of a plan based on a contract of insurance inherently implicate the hobgoblin of self-interest. Adverse benefits determinations save considerable sums that are

*Shield,* 898 F.2d 1556, 1566–67 (11th Cir. 1990). The Tenth Circuit recently rejected this test in favor of a "sliding scale" approach. *See Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 825–27 (10th Cir. 1996). The court noted that the sliding scale approach "more closely adheres to the Supreme Court's instruction to treat a conflict of interest as [merely] a 'facto[r] in determining whether there is an abuse of discretion.' " *Id.* at 826 (alteration in original) (citing *Firestone,* 489 U.S. at 115).

Under the "sliding scale" approach, a reviewing court must apply an arbitrary and capricious standard of review, but must reduce the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict. *Id.* at 825. In other words,

> to the extent that [Guardian] has discretion to avoid paying claims, it thereby promotes the potential for its own profit . . . . In short, [Guardian's] decision will be entitled to some deference, but [this] deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

*Id.* at 826 (quoting *Pitman v. Blue Cross & Blue Shield,* 24 F.3d 118, 123 (10th Cir.1994) (quoting *Doe v. Group Hospitalization & Med. Servs.,* 3 F.3d 80, 86 (4th Cir.1993))). The Tenth Circuit has identified numerous indicia of arbitrary and capricious conduct. These include decisions that are not supported by substantial evidence, are predicated on erroneous legal interpretations, or are made by fiduciaries acting in bad faith or under a conflict of interest. *Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 380 n. 4 (10th Cir.1992).

### B. Procedural Posture of Case

Defendant filed a motion for summary judgment in this case. Although the Tenth Circuit has resolved ERISA suits in a summary judgment posture in the past, this court does not believe that summary judgment is the proper means by which to assess an ERISA plan administrator's denial of benefits under an arbitrary and capricious stan-

returned to the fiduciary's corporate coffers." *Caldwell,* 959 F.Supp. at 1366 (citation omitted).

dard of review. In *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1579–80 (10th Cir.1994) (Kane, J., sitting by designation), the Tenth Circuit held that motions for summary judgment are inconsistent with the standards for judicial review of actions in which the court is confined to the administrative record in its analysis. The circuit noted that in evaluating such administrative actions, a trial court effectively functions as an appellate court and should govern itself by referring to the Federal Rules of Appellate Procedure. *Id.* at 1580.

While *Olenhouse* focused on the judicial review of administrative *agency* decisions, its reasoning seems no less applicable to suits seeking review of the denial of ERISA benefits that are limited in their scope to the administrative record. In fact, the official note accompanying D. Kan. R. 83.7, which is patterned after Federal Rule of Appellate Procedure 15, indicates the rule "is intended to apply to all types of cases involving the review of administrative proceedings." Applying the *Olenhouse* analysis to ERISA cases with an arbitrary and capricious standard of review encourages courts to assess the record substantively and discourages them from relying on either the post hoc rationalizations of counsel or the court's own reasoning with a general disregard for the contents of the administrative record. *See Olenhouse,* 42 F.3d at 1580.

In reviewing an ERISA plan administrator's denial of benefits under an arbitrary and capricious standard, courts "generally may consider only the arguments and evidence before the administrator at the time it made that decision." *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 823 (10th Cir.1996) (citing *Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 380 (10th Cir. 1992)). Moreover, although the Tenth Circuit, in *Zimmerman v. Sloss Equip., Inc.,* 72 F.3d 822, 829–30 (10th Cir.1995), declined to consider whether ERISA plaintiffs are entitled to a jury trial, the court implied that jury trials are incompatible with the application of an arbitrary and capricious standard of review.[2] With these principles in mind,

**2.** The Tenth Circuit likely will resolve this issue definitively in *Adams v. Cyprus Amax Minerals Co.,* Appeal No. 97–1105, the oral arguments in which were held January 23, 1998.

the author of the *Olenhouse* opinion recently observed that ERISA's highly limited scope of review in cases mandating only arbitrary and capricious scrutiny makes summary judgment "an inappropriate vehicle for evaluating" a plan administrator's conduct. *Clausen v. Standard Ins. Co.*, 961 F.Supp. 1446, 1455 (D.Colo.1997) (Kane, J.) (citing *Olenhouse*, 42 F.3d at 1579 & n. 31). The proper approach is to insure that all materials in the administrative record have been submitted and then analyze the case on the basis of that record under an arbitrary and capricious standard of review.

## II. Administrative Record Factual Findings

The following facts are based exclusively on the administrative record submitted by the parties. Arguments not made and documents not submitted in the administrative review process are omitted.

Plaintiff Karen Brooks worked for Quality Health Care, Inc. (Quality) in either a nursing director or administrator position from the time the company purchased its facility in 1980 through 1988. In September 1987, Quality subscribed to a Professional and Technical Services Industry Insurance Trust that defendant Guardian Life Insurance Company of America (Guardian) had created for the purpose of providing Guardian group policies to subscribers of the Trust. Quality also purchased a rider that provided long-term disability benefits for its employees. As a full-time employee, plaintiff was automatically enrolled as a participant in these insurance programs.[3]

The Employer Rider to the group insurance policy sets forth the terms of Guardian's long-term disability coverage. Those terms also were communicated to plaintiff under a Certificate of Coverage. In relevant part, the rider provides as follows:

"We", "us", "our" and "Guardian" mean The Guardian Life Insurance Company of America.

\* \* \* \* \* \*

**When and How this Plan's Net Monthly Payments Start:** To start getting net monthly payments from this plan, an employee must meet all of the following conditions.

\* \* \* \* \* \*

(c) *the employee must send us acceptable written proof of:* (i) his total disability; (ii) his prior monthly earnings; and (iii) any current monthly earnings.

If an employee's regular occupation requires that he pass periodic physical checkups, we don't view his failure to do so as proof that he's disabled. And, we don't accept as proof of disability, certification of disability from a doctor who is: (a) a disabled employee; or (b) a business associate, spouse, parent, child, brother or sister of a disabled employee.

Once we approve the employee's initial proofs of disability and earnings, we start to make net monthly payments.

\* \* \* \* \* \*

*We require periodic proof* of: (a) continued disability; (b) continued regular doctor's care for the cause of the disability; and (c) any current monthly earnings.

\* \* \* \* \* \*

**When disability ends:** An employee's disability ends on the earlier of: (a) the date he is able to earn at a rate of at least 80% of his prior monthly earnings; or (b) *the date we determine he is able to perform all of the material duties of his regular occupation on a full-time basis, even if he chooses not to.*

(Def.'s Mot. for Summ. J. at 3, ¶ 3) (emphasis added).

In March 1988, plaintiff underwent surgery for a detached retina in her left eye. On August 30, 1988, plaintiff began receiving long-term disability benefits payments from Guardian for a partial disability relating to her eye condition.

On December 8, 1993, Mavis Benner, a rehabilitation counselor acting on behalf of Guardian, reviewed plaintiff's disability status. (Pl.'s Supp. Doc. in Opp'n to Def.'s Mot. for Summ. J.). After speaking with plaintiff, Ms. Benner concluded that plaintiff remained disabled and that her disability benefits

---

**3.** Quality paid all required premiums due on behalf of its eligible employees.

should continue. Ms. Benner based this conclusion only on plaintiff's responses to her questions and not on any medical evaluation. (Def.'s Reply, Krause Depo. at 48 & 50). As a result of Ms. Benner's recommendation to Guardian, plaintiff continued to receive disability payments through October 1995.

On March 5, 1995, Terri Quinn, an in-house registered nurse with Guardian, performed a disability management specialist review of plaintiff's file and documented her determination that an independent medical evaluation should be performed on plaintiff. Guardian requested Northeast M.E.D.S., P.C., an independent service provider, to select an ophthalmologist to perform an independent medical examination and to schedule an appointment for plaintiff. Northeast M.E.D.S. selected Dr. Gregory Quinlan, D.O., a board certified ophthalmologist, and wrote to him on March 16, 1995, requesting that he perform the independent medical examination. Guardian itself had no role in the selection of Dr. Quinlan as the independent medical examiner.

Dr. Quinlan examined plaintiff on March 28, 1995 and sent a report, dated April 17, 1995, directly to Northeast M.E.D.S.'s offices in Williston, New York. A registered nurse at Northeast M.E.D.S. then prepared a summary of Dr. Quinlan's report and sent both the report and summary to Guardian. In the report, Dr. Quinlan, who had never met plaintiff prior to this appointment, observed that plaintiff's vision was 20/25 in her right eye and "count fingers" in her left eye. He remarked that this vision seemed to be "somewhat less than it was in her previous exams." [4] (Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 10 at 1). Nevertheless, Dr. Quinlan concluded that plaintiff was not "totally disabled by any means" and was "capable of doing administrative and supervisory nursing duties" even with limited vision in her left eye. (*Id.*).

In May 1995, shortly after assuming responsibility for the evaluation of plaintiff's claim, Diann Krause, a Guardian Benefit Analyst, reviewed Dr. Quinlan's medical report. On June 2, 1995, Ms. Krause wrote to Dr. John Yuhas, plaintiff's attending physician,

enclosing Dr. Quinlan's independent medical evaluation, and requested Dr. Yuhas' comments. On June 30, 1995, Dr. Yuhas sent a letter to Guardian indicating that he disagreed with Dr. Quinlan's findings and opining that plaintiff was incapable of full-time work.

In July 1995, Guardian referred plaintiff's claim to an independent service provider, MetraHealth (also known as National Specialty Review Services) in order to obtain an independent peer physician review. As part of this referral, Guardian submitted a completed Guardian Group Disability Peer Review Request Form in which the company identified plaintiff's attending physician as Dr. Yuhas and provided Dr. Yuhas's address and phone number. The Request Form sought a review of plaintiff's chart and records, asked that the reviewing physician consult with Dr. Yuhas, and requested a determination of whether plaintiff could return to work on a full-time basis. (Def.'s Reply, Krause Supp. Depo., Ex. F at 2). Guardian provided MetraHealth with all medical records in its file relating to plaintiff's claim, including records from both Dr. Quinlan and Dr. Yuhas. Guardian also included in the materials the June 30, 1995 correspondence from Dr. Yuhas.

MetraHealth then selected Dr. Helen Davis, M.D., to perform the independent peer physician review and provided her with all the records and forms that it had received from Guardian. Guardian played no role in the selection of the peer review physician and had no contact with Dr. Davis. Having disseminated all its files to MetraHealth, Guardian believed Dr. Davis was aware that Dr. Yuhas was plaintiff's attending physician and that Dr. Yuhas felt plaintiff could not return to work full-time. Dr. Davis sent her report directly to MetraHealth which subsequently forwarded the report to Guardian on August 10, 1995.

In her report, Dr. Davis concluded that plaintiff's poor vision in the left eye did not preclude her from returning to work on a full-time basis. In reaching this determination, Dr. Davis indicated that she had re-

---

4. There is no indication in the record whether Dr. Quinlan predicated his comment regarding the diminution of plaintiff's visual acuity on a review of plaintiff's medical records or on her personal recollections.

viewed all charts and medical records, had consulted with Dr. Yuhas, and had discussed the case with Dr. Quinlan. Dr. Yuhas, however, insists that Dr. Davis did not contact him at any time.

On September 15, 1995, Terri Quinn performed a nurse specialist assessment of plaintiff's claim and examined each of the medical reports and physician reviews discussed above. After an analysis of these materials, Quinn recommended that Guardian accept the findings of Dr. Quinlan and Dr. Davis. Three days later, Guardian prepared a report summarizing the medical opinions of Drs. Quinlan, Yuhas, and Davis and the recommendation of Terri Quinn. In that report, Guardian determined that plaintiff was no longer eligible for long-term disability benefits.

On September 22, 1995, Dana Guffy, a Guardian Benefit Analyst, and Carmen Huertas, Guardian's Senior Group Disability Benefit Analyst, both reviewed the September 18, 1995 report and concurred with the conclusion that plaintiff was not disabled and, therefore, no longer entitled to disability benefits. On October 2, 1995, Guardian notified plaintiff of its decision to terminate her disability benefits, the reasons therefor, and her rights under ERISA to request a review of the decision within sixty days.

On October 30, 1995, plaintiff wrote Guardian to inform the company that she would be appealing her denial of benefits. On November 17, 1995, Guardian informed plaintiff that she had to submit any additional objective medical evidence supporting her claim no later than December 20, 1995 or else her claim would be reevaluated based solely on the materials Guardian had in its files. Plaintiff did not submit any additional information.

On January 23, 1996, Dorothy Butler, an in-house registered nurse at Guardian, reviewed plaintiff's file and recommended that Guardian adhere to its original denial of plaintiff's disability benefits. In a February 21, 1996 letter, Carmen Huertas informed plaintiff that Guardian was upholding its de-nial of her long-term disability benefits. Huertas also explained to plaintiff her rights under ERISA to appeal that decision within sixty days.

On April 12, 1996, Guardian received a letter from plaintiff's attorney requesting a review of the denial of her appeal. On May 31, 1996, pursuant to this request, Guardian conducted a review of plaintiff's file to determine the propriety of its earlier decisions. On June 3, 1996, Karen Velk, a Group Disability Claim Team Leader with Guardian, wrote to plaintiff's attorney summarizing the company's review of plaintiff's file, indicating that Guardian would be upholding its prior denials of plaintiff's long-term disability benefits, and noting plaintiff's right to appeal under ERISA within sixty days. Plaintiff sought no further review of her claim through Guardian and filed the instant action on December 12, 1996.

## III. Discussion

Plaintiff insists that defendant opted to discontinue her long-term disability benefits in bad faith. She predicates this contention on the fact that: (1) Dr. Davis did not consult with Dr. Yuhas prior to issuing the peer physician review; (2) her vision had worsened from the time she first began receiving disability benefits in 1988 until defendant terminated the benefits in 1995; and (3) defendant acted at all times under a conflict of interest.[5] The court will address each theory in turn.

### A. Lack of Consultation Between Dr. Davis and Dr. Yuhas

■ Defendant is not responsible for Dr. Davis' omissions. Dr. Davis acted as an independent physician—hired by Metra-Health—to provide Guardian with an independent peer physician review. Guardian had no role in her selection and had no direct contact with her. Her apparent failure to consult with Dr. Yuhas, therefore, does not amount to bad faith on the part of Guardian. Guardian provided MetraHealth with all of

5. With the exception of Dr. Davis' failure to contact Dr. Yuhas personally, plaintiff does not allege that she was denied a "full and fair review" of her claim as the Tenth Circuit has defined that term. *See Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 381–82 (10th Cir. 1992) (citations omitted).

plaintiff's medical records and requested that any physician MetraHealth selected consult with plaintiff's attending physician. Guardian did nothing to interfere with any such consultation and remained under the impression, in fact, that a consultation had taken place.

Moreover, the fact that Dr. Davis had no personal discussions with Dr. Yuhas prior to issuing her report is immaterial. There is no dispute that Dr. Davis reviewed all of plaintiff's medical records, including Dr. Yuhas' June 1995 correspondence to Guardian in which he described in great detail his opinions regarding plaintiff's disability status and inability to work on a full-time basis. Thus, Dr. Yuhas did have input in Dr. Davis' evaluation. Dr. Davis simply disagreed with Dr. Yuhas' assessment as did Dr. Quinlan in his independent analysis. At the summary judgment hearing, plaintiff's counsel averred that "if Dr. Davis had spoken to Dr. Yuhas, *maybe* her report would have been different." (emphasis added). If the court were conducting a de novo review, this argument might have some merit. Under an arbitrary and capricious standard, however, the fact that an alternative conclusion was possible does not permit the reversal of a plan administrator's denial of benefits.

Finally, Dr. Quinlan's report, upon which Dr. Davis apparently based much of her conclusions, appears medically sound. Dr. Quinlan specifically noted that because plaintiff's vision in her right eye was good, she could perform administrative and nursing directorship responsibilities on a full-time basis. He observed that while she may have some difficulty doing "close work" for extended periods of time, such a restriction does not render her completely disabled.

Although Dr. Quinlan's findings may have been inconsistent with Dr. Yuhas' opinions, Guardian's effective reliance on Dr. Quinlan's conclusions does not mean that the company's conduct was arbitrary and capricious. *Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377 (10th Cir.1992) underscores this point. In *Sandoval,* the ERISA plan administrator terminated the plaintiff's disability benefits after determining that the plaintiff was no longer totally disabled. In reaching this conclusion, the administrator opined that the medical findings of an independent physi-

cian hired by the insurer were more persuasive than those of the plaintiff's personal physician. *Id.* at 382. The plaintiff, whose own doctor insisted that plaintiff continued to be fully disabled, argued that the administrator's determination was not supported by substantial evidence. Affirming the judgment of the district court, the Tenth Circuit held that contrary conclusions regarding the plaintiff's disability status do not render the administrator's decision to terminate benefits arbitrary and capricious. *Id. Accord Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1452 (11th Cir.1997); *Taft v. Equitable Life Assurance Soc'y,* 9 F.3d 1469, 1473–74 (9th Cir.1993); *Bolling v. Eli Lilly & Co.,* 990 F.2d 1028, 1029–30 (8th Cir.1993).

The plan administrator's conduct in the case at bar is even more sound than that of the administrator in *Sandoval.* Defendant here retained an independent third-party physician (or, more accurately, retained an independent referral agency to select an independent physician) to review the conflict between plaintiff's attending physician and another independent ophthalmologist who examined plaintiff. In *Sandoval,* the Tenth Circuit upheld the plan's termination of benefits under an arbitrary and capricious standard without any third-party evaluation of the conflicting medical opinions.

### B. Worsening of Plaintiff's Vision

■ Plaintiff next argues that since Dr. Quinlan reported that plaintiff's vision "seemed to be somewhat less than it was in her previous exams," his opinion that plaintiff could return to work on a full-time basis is unfounded. Defendant astutely points out, however, that plaintiff's contention undermines her theory that she is disabled. In his June 1995 correspondence to Guardian, Dr. Yuhas identified plaintiff's primary visual problem as anisometropia. (Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 12). He noted that "[w]hile it is true that there are many patients who are able to work on a full time basis with only monocular vision, Mrs. Brooks is not a true monocular patient, as she does have some residual vision in the left eye." (*Id.*).

Both parties agree that anisometropia can present a severe problem if an individual has poor vision in one eye that results in a different sized image from the other eye. Based on Dr. Yuhas' statement in his June 30, 1995 letter, the parties appear to agree further that if an individual's vision in one eye is useless, such that it provides no useful image, the potential difficulties associated with seeing different images are eliminated. In plaintiff's case, if her right eye visual acuity had worsened to the point of uselessness—from 20/400 in 1990 to "count fingers" in 1995—there would be no lingering physical impediments tied to anisometropia. Thus, nothing prevents her from returning to work on a full-time basis.

### C. Defendant's Conflict of Interest

 Plaintiff also avers that defendant's inherent conflict of interest renders any decision to deny or terminate benefits highly suspect. The Tenth Circuit, however, already accounts for this conflict in the diminished deference it accords to plan administrators under the "sliding scale" standard of review. As Judge Vratil recently noted:

> Pursuant to federal regulations, an insurance company subject to state regulations is deemed to be an adequate fiduciary for the purpose of reviewing claim denials, and such companies are deemed by ERISA to be capable of carrying out a full and fair review of their decisions to deny benefits, even in situations where a conflict of interest is found to exist.

*Healthcare Am. Plans, Inc. v. Bossemeyer,* 953 F.Supp. 1176, 1191 (D.Kan.1996) (citing *Ford v. Metropolitan Life Ins. Co.,* 834 F.Supp. 1272, 1281 (D.Kan.1993)). Plaintiff has articulated no specific conflicts confronting the plan administrator. She does not argue that any of defendant's individual employees received financial incentives for minimizing benefits, had undue pressure placed upon them to effectuate a denial of coverage, or exhibited personal animus toward her during the review process. Nor does she adduce any evidence that defendant grounded its decision on the likely cost of continued benefits. Plaintiff's sole contention is that an inherent conflict of interest casts suspicion on defendant's termination of her benefits. Absent evidence of a more compelling con-

flict, the court cannot say that the plan administrator acted in an arbitrary and capricious fashion. *See Kaus v. Standard Ins. Co.,* 985 F.Supp. 1277, 1281 (D.Kan.1997); *Bossemeyer,* 953 F.Supp. at 1191.

IT IS, THEREFORE, BY THE COURT ORDERED that defendant's motion for summary judgment (Doc. 30) is granted.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**